**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
Joshua D. Arisohn (*Admitted Pro Hac Vice*)
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail:  scott@bursor.com
         jarisohn@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ALBINO LUCERO JR., on Behalf of Himself and all Others Similarly Situated, | Case No. 3:15-cv-05107-RS |
| Plaintiff, | **DECLARATION OF JOSHUA D. ARISOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| v. | |
| SOLARCITY CORP., | Date: March 9, 2017 |
| Defendant. | Time: 1:30 PM |
| | Courtroom 3, 17th Floor |
| | Hon. Richard G. Seeborg |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

I, Joshua D. Arisohn, declare as follows:

1.  I am an attorney at law licensed to practice in the State of New York.  I have been admitted *pro hac vice* in this matter, and I am an attorney with Bursor & Fisher, P.A., counsel of record for Plaintiff.  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would competently testify thereto under oath.

2.  Attached hereto as Exhibit A is a true and correct copy of excerpts from the transcript of the deposition of ███████████████████████████████████ ███████████████████████

3.  Attached hereto as Exhibit B is a true and correct copy of the transcript of excerpts from the deposition of ████████████████████████████████ ████████████

4.  Attached hereto as Exhibit C is a true and correct copy of the transcript of excerpts from the deposition of ██████████████████████████████████████ ██████████████████████

5.  Attached hereto as Exhibit D is a true and correct copy of a document titled ███ ████████████████████████████████████

6.  Attached hereto as Exhibit E is a true and correct copy of an ██████████████ ████████████████████

7.  Attached hereto as Exhibit F is a true and correct copy of an ██████████████ ████████████████████

8.  Attached hereto as Exhibit G is a true and correct copy of ███████████████ ██████████████████████████████

9.  Attached hereto as Exhibit H is a true and correct copy of ██████████████ ██████████████████████████████████

10.  Attached hereto as Exhibit I is a true and correct copy of ████████████████ ██████████████████████████████

11.     Attached hereto as Exhibit J is a true and correct copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12.     Attached hereto as Exhibit K is a true and correct copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13.     Attached hereto as Exhibit L is a true and correct copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14.     Attached hereto as Exhibit M is a true and correct copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15.     Attached hereto as Exhibit N is a true and correct copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16.     Attached hereto as Exhibit O is a true and correct copy of screenshots from Plaintiff Lucero's phone showing call records for calls made by Defendant SolarCity Corp., produced by Plaintiff at LUCERO000 LUCERO000020-23.

17.     Attached hereto as Exhibit P is a true and correct copy of the Account Summary for Plaintiff Lucero's account with Net10, produced by Plaintiff at LUCERO000012-18.

18.     Attached hereto as Exhibit Q is a true and correct copy of excerpts from the transcript of the deposition Plaintiff Lucero.

19.     Attached hereto as Exhibit R is a true and correct copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20.     Attached hereto as Exhibit S is a true and correct copy of emails demonstrating Plaintiff's registration on the National Do Not Call Registry, produced by Plaintiff at LUCERO000004-06.

21.     Attached hereto as Exhibit T is a true and correct copy of the Firm Resume for Bursor & Fisher, P.A.

22.     Attached hereto as Exhibit U is a true and correct copy of the Firm Resume for Nathan & Associates, APC.

23.     Attached hereto as Exhibit V is a true and correct copy of ████████

████████████████████████████████████████████████

24.     Attached hereto as Exhibit W is a true and correct copy of ████████

████████████████████████████████████████████████

████████████

I declare under penalty of perjury that the foregoing is true and correct.  Executed

on December 14, 2016 at New York, New York.

                                            */s/ Joshua D. Arisohn*
                                            Joshua D. Arisohn

**EXHIBIT A**

**CONFIDENTIAL - REDACTED**

**EXHIBIT B**

**CONFIDENTIAL - REDACTED**

**EXHIBIT C**

**CONFIDENTIAL - REDACTED**

**EXHIBIT D**

**CONFIDENTIAL - REDACTED**

**EXHIBIT E**

**CONFIDENTIAL - REDACTED**

**EXHIBIT F**

**CONFIDENTIAL - REDACTED**

**EXHIBIT G**

**CONFIDENTIAL - REDACTED**

**EXHIBIT H**

**CONFIDENTIAL - REDACTED**

**EXHIBIT I**

**CONFIDENTIAL - REDACTED**

**EXHIBIT J**

**CONFIDENTIAL - REDACTED**

**EXHIBIT K**

**CONFIDENTIAL - REDACTED**

**EXHIBIT L**

**CONFIDENTIAL - REDACTED**

**EXHIBIT M**

**CONFIDENTIAL - REDACTED**

**EXHIBIT N**

**CONFIDENTIAL - REDACTED**

**EXHIBIT O**









**EXHIBIT P**



Which email address would you prefer to use?
This will be your login username for your NET10 My Account. Please select one and click "Continue."



CONTINUE

*At 2G speeds, the functionality of some data applications such as streaming video or audio may be affected.          Feedback

†To get 4G LTE speed, you must have a 4G LTE capable device and 4G LTE SIM. Actual availability, coverage and speed may vary. LTE is a trademark of ETSI. Please refer always to the Terms and Conditions of Service at net10wireless.com.

© 2016 TracFone Wireless Inc. All Rights Reserved.

Check Balance    Go to Account Summary    Sign Out    Search NET10    Español

10°

## Payment History

Welcome ████
Tue Aug 09 12:25:51 EDT 2016

For fast answers
Text **HELP**
To **611611**

| Transaction Date | Payment Date | * Serial Number (also called IMEI, MEID DEC, MEID HEX, or ESN): | Transac ID | Description | Account Number | Payment Status | Total Paid | Details |
|---|---|---|---|---|---|---|---|---|
| 2016-07-28 | 2016-07-28 | 2684354626121932899 | BP20160728176520899 | Program charges for the cycle 07/28/2016 to 08/26/2016 for UNLIMITED $40 MONTHLY PLAN | ***********9404 | Approved | $39.24 | Details |

| | |
|---|---|
| **Subtotal** | $36.00 |
| **Discounts and Credits** | $0.00 |
| **Tax**[1] | $2.63 |
| **Prepaid Wireless 911**[2] | $0.00 |
| **Federal Universal Service**[3] | $0.54 |
| **Regulatory Cost Recovery**[4] | $0.07 |
| **Purchase Amount** | $39.24 |

| Transaction Date | Payment Date | Serial Number | Transac ID | Description | Account Number | Payment Status | Total Paid | Details |
|---|---|---|---|---|---|---|---|---|
| 2016-06-28 | 2016-06-28 | 2684354626121932899 | BP20160628171807182 | Program charges for the cycle 06/28/2016 to 07/27/2016 for UNLIMITED $40 MONTHLY PLAN | ***********9404 | Approved | $39.20 | Details |
| 2016-05-29 | 2016-05-29 | 2684354626121932899 | BP20160529167338481 | Program charges for the cycle 05/29/2016 to 06/27/2016 for UNLIMITED $40 MONTHLY PLAN | ***********9404 | Approved | $39.20 | Details |

[1] Tax and charge/fee amounts are estimated based on the home area for your phone. If your address is in a different city and zip code, the actual tax and charge/fee amounts will be based on your address information, so the amounts may vary from the original estimate.

[2] A fee, charge, or surcharge to fund state and/or local E911-related programs imposed by law on prepaid wireless users or assessed by us to recover the cost of complying with E911 laws and regulations, and, in California, Prepaid Mobile Telephony Services (MTS) Surcharge.

[3] This amount is to help recover our contribution requirement to federal universal service.

[4] This amount is to help recover our costs related to complying with government regulations and programs.

If a payment does not appear above, please process your payment again or contact our Customer Care Center at 1-877-836-2368. Please provide us with your NET10 phone's Serial Number or your NET10 Telephone number when contacting us, so we can give you the best possible service.

VIEW/CHANGE PAYMENT INFORMATION    PRINT

CONFIDENTIAL

LUCERO000014

,

*At 2G speeds, the functionality of some data applications such as streaming video or audio may be affected.     **Feedback**

†To get 4G LTE speed, you must have a 4G LTE capable device and 4G LTE SIM. Actual availability, coverage and speed may vary. LTE is a trademark of ETSI. Please refer always to the Terms and Conditions of Service at **net10wireless.com**.

© 2016 TracFone Wireless Inc. All Rights Reserved.

CONFIDENTIAL                                                                    LUCERO000015



Check Balance    Go to Account Summary    Sign Out    [Search NET10]    Español

**10**

## VIEW/CHANGE PAYMENT INFORMATION

Welcome ███████
Tue Aug 09 12:41:46 EDT 2016

The following payment information is currently on file for online

For fast answers
Text **HELP**
To **611611**

NOTE: To remove a Credit Card that is associated to a Value Pla          ollment:1. Add a new Credit Card (?Add payment source? link) if you don?t already have it in your My Account.2. Select the new Credit Card from the dropdown in the Payment Method section and click ?Apply?. Repeat this for each enrollment associated to the card to be removed.3. Once there are no additional enrollments associated to the credit card, you will be able to select the ?Remove? button.

**Add payment source**

### Payment source:

| ███████████ | | ██ |
| ██████████ | | ██████████ |
| ██████████ | | 02/2018 |

| Nickname (Optional) | Enrolled Plan | Payment Method | |
|---|---|---|---|
| Al Lucero NET10 ███████ | UNLIMITED $40 MONTHLY PLAN | ██ ▼ | APPLY |

EDIT    REMOVE

'

*At 2G speeds, the functionality of some data applications such as streaming video or audio may be affected.    **Feedback**

†To get 4G LTE speed, you must have a 4G LTE capable device and 4G LTE SIM. Actual availability, coverage and speed may vary. LTE is a trademark of ETSI. Please refer always to the Terms and Conditions of Service at **net10wireless.com**.

© 2016 TracFone Wireless Inc. All Rights Reserved.

CONFIDENTIAL

Check Balance     Go to Account Summary     Sign Out     Search NET10     Español

**10**

## Update Personal Profile

Welcome ███████
Tue Aug 09 12:30:50 EDT 2016

You can update your personal information by either editing or a   *For fast answers*   the fields below; please make sure to press "Save" to
update your new information or "Cancel" to void it.   Text **HELP**
To **611611**

If you want to change your birthday, please contact our customer service line.

( * Required Fields )

Social Media

**Link your existing NET10 My Account with Facebook.**
This will allow you to sign in with your Facebook information.

☐

### Personal Information

|  |  |  |  |
|---|---|---|---|
| *First Name: | Lucero | | |
| *Last Name: | Al | | |
| Date of Birth: | Month ▾ | Day ▾ | Year ▾ |
| * Address: | ███████████ | | |
| Suite / Apt.: | █████ | (ex: apt/suite #) | |
| *Zip Code: | ████ | | |
| Home Phone #: | | | |

☐ Yes! I would like to receive prerecorded messages regarding special offers and promotions from NET10 at the number provided above.

☐ Please check this box if you would like to receive valuable savings offers from NET10 partners. You can unsubscribe at any time by updating this option in My Account. (We never share your information with third party vendors; any offers will be sent directly by us)

### Login Information

Current Email Address: ███████████

Enter Your New Information

New Email: _____ (ex: john@abc132z.com)

CONFIDENTIAL

Confirm New Email: _____

LUCERO000017

| | |
|---|---|
| **New Password:** | ☐ (min. 6 characters) |
| **Confirm New Password:** | ☐ |

## Security Question Setup

For your security, please select a security question. You will need to answer this question for future account information retrieval

| | | |
|---|---|---|
| **\* Security Question:** | ▇▇▇▇▇▇▇ ▼ | HELP |
| **\* Answer:** | ▇ | |

## Set Account Owner

Please select one phone from your account to be set as your account Owner.

| | |
|---|---|
| **Phones currently on your account:** | ▇▇▇▇ ▼ |

This is the only phone that will be authorized to make changes to the account.

CANCEL   SAVE

Privacy Policy

,

*At 2G speeds, the functionality of some data applications such as streaming video or audio may be affected.

Feedback

†To get 4G LTE speed, you must have a 4G LTE capable device and 4G LTE SIM. Actual availability, coverage and speed may vary. LTE is a trademark of ETSI. Please refer always to the Terms and Conditions of Service at net10wireless.com.

© 2016 TracFone Wireless Inc. All Rights Reserved.

**EXHIBIT Q**

**Jose Albino Lucero, Jr.**                    **Morris, et al. vs. SolarCity Corp., et al.**

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2


 3
      GEORGE MORRIS, JOSE ALBINO
 4    LUCERO JR. and DAVID HALL on
      Behalf of Themselves and all
 5    Others Similarly Situated,
                                No. 3:15-cv-05107
 6            Plaintiffs,

 7    vs.

 8    SOLARCITY CORP. and LEAD
      GENESIS, INC.,
 9
              Defendants.
10

11

12

13     VIDEOTAPED DEPOSITION OF JOSE ALBINO LUCERO, JR.

14                 November 28, 2016
                      9:27 a.m.
15     Modrall, Sperling, Roehl, Harris & Sisk, P.A.
                500 Fourth Street, Northwest
16                Albuquerque, New Mexico

17

18
            PURSUANT TO THE FEDERAL RULES OF CIVIL
19             PROCEDURE this deposition was:

20
      TAKEN BY:      ELYSE D. ECHTMAN, ESQ.
21                   ATTORNEY FOR DEFENDANT

22

23    REPORTED BY:   ANA MARIA GALLEGOS, RPR, CLR
                      NM CCR #190, CA CSR #9246
24

25    JOB NO.:       10028244
```

1  a phone call from SolarCity?

2       A.  I think it was on April 29th.

3       Q.  **Tell me what happened on April 29th.**

4       A.  Yet another call.

5       Q.  **Did you notice this call at the time that it**

6  **was made?**

7       A.  I think so, yeah.

8       Q.  **Tell me what you recall about it.**

9       A.  Looking at the phone, recognizing the

10  number, and not answering it.

11       Q.  **Do you know where you were on April 29th**

12  **when this happened?**

13       A.  No.

14       Q.  **Do you know what day of the week it was?**

15       A.  No.

16       Q.  **Let's go back to April 15.  What reaction,**

17  **if any, did you have to receiving this voicemail**

18  **that you deleted without listening to it?**

19       A.  Well, with each call, I game more annoyed

20  that they were bothering me and calling me without

21  my consent.  Just kept notching it up.

22       Q.  **So what was your level of annoyance an**

23  **April 15th?**

24       A.  Higher than before.

25       Q.  **And did you do anything to contact a lawyer**

Jose Albino Lucero, Jr.                    Morris, et al. vs. SolarCity Corp., et al.

1   on April 15th?

2        A.   No.

3        Q.   Did you make a complaint to SolarCity?

4        A.   No.

5        Q.   On April 29, what was your reaction?

6        A.   Very annoyed.   Because they persisted in

7   calling me.

8        Q.   So you were at a higher level of annoyance

9   that you had previously?

10       A.   Yes.

11       Q.   Can you compare it to any other things in

12   your life that tend to annoy you?

13       A.   Probably a lot of things.   Bad drivers, just

14   very annoying, aggravating.

15       Q.   Okay.   And so what did you do next on

16   April 29?   Did you do anything about the fact that

17   you were annoyed?

18       A.   Before then, I had did something.   I

19   researched SolarCity and telemarketing.   Found some

20   articles that described how they were calling a lot

21   of people repeatedly.   Repeatedly.

22       Q.   Tell me about when you did that research on

23   SolarCity and telemarketing?

24       A.   I can't tell you exactly which day.   I just

25   remember doing it.

Page 52

1    Q.  What type of research did you do?

2    A.  Googling SolarCity telemarketing.

3    Q.  And what did you find from your Google

4  search?

5    A.  That this was happening to a lot of people.

6    Q.  Where did you find that information?

7    A.  It was a news article I read.

8    Q.  By what news organization?

9    A.  Well, I don't recall that.  I don't know.

10    Q.  And what did you do next?

11    A.  I may have written right after that at some

12  point an e-mail to Bursor & Fisher.

13    Q.  How did you find Bursor & Fisher?

14    A.  I think they were mentioned in one of the

15  articles I read.

16    Q.  And do you know what date that was?

17    A.  No, I don't.

18    Q.  Did you save that e-mail?

19    A.  It's saved in my e-mail, yes.

20    Q.  Did you reach out at all to a firm named

21  Nathan & Associates?

22    A.  No.

23    Q.  So you reached out directly to Bursor &

24  Fisher?

25    A.  Yes.

1    Q.  And did there come a time that you retained

2  Bursor & Fisher to represent you?

3    A.  Yes.

4    Q.  When did you do that?

5    A.  I don't remember the date.  But it was

6  probably in April.

7    Q.  Was it prior to the April 29 call?

8    A.  Yes.

9    Q.  So it was between April 15 and April 29?

10    A.  I believe so.

11    Q.  Okay.  Did you enter into a retention

12  agreement with Bursor & Fisher?

13    A.  Yes.

14    Q.  Do you have a contingency fee agreement with

15  Bursor & Fisher?

16    A.  I don't know.  I don't remember.

17    Q.  You signed a document with Bursor & Fisher

18  setting out the terms --

19    A.  Yes.

20    Q.  -- of your retention of them?

21    A.  Yes.

22    Q.  And do you have any understanding of how

23  Bursor & Fisher might get paid?

24    A.  No, I don't.

25    Q.  Okay.  After -- so when you saw the call

1  come in on April 29, you saw it as it was coming in

2  to your phone?

3      A.  I don't remember.

4      Q.  Okay.  So you might have seen it on your

5  phone afterwards?

6      A.  Yes.

7      Q.  And you didn't pick up the phone?

8      A.  Correct.

9      Q.  Did you receive any other phone calls?

10     A.  I may have.  I remember five of them.  Or I

11 know that there were five at least in April.

12          MR. KRIVOSHEY:  Do you think we can take a

13 break soon?  We've been going for a little over an

14 hour.

15          MS. ECHTMAN:  Sure.  We can take a break

16 right now.

17          THE VIDEOGRAPHER:  We're going off the

18 record.  The time is 10:34.

19          (Recess was taken.)

20          THE VIDEOGRAPHER:  This begins DVD number

21 two in the deposition of Jose Albino Lucero, Jr.

22          We're going back on the record.  The time is

23 10:51.

24     Q.  (By Ms. Echtman) Mr. Lucero, can you tell me

25 what your telephone number is?

Jose Albino Lucero, Jr.                         Morris, et al. vs. SolarCity Corp., et al.

```
1       A.   ████████████
2       Q.   How long have you had that phone number?
3       A.   I think at least ten years.
4       Q.   Have you always had this number on a cell
5  phone?
6       A.   Yes.
7       Q.   And what cell phone carrier do you use?
8       A.   Net10.
9       Q.   What type of a plan do you have with Net10?
10      A.   Monthly.
11      Q.   How much do you pay per month?
12      A.   About $40.
13      Q.   What does that include?
14      A.   Phone and data.
15      Q.   Is there any limit on your phone and data?
16      A.   Not on the calls.  And I believe there is on
17  the data.
18      Q.   What is the limit on the data?
19      A.   I think it's five gigabytes.
20      Q.   Have you ever used all five gigabytes of
21  data in a month?
22      A.   Never, that I can remember.
23      Q.   And you said the phone is unlimited?
24      A.   Yes.
25      Q.   So you don't get charged per phone call?
```

1    A.  No.

2    Q.  So you didn't have any charge from Net10 for

3 the phone call that you received from SolarCity?

4    A.  Not over what I've already paid them for the

5 use of their service.

6    Q.  You pay a flat monthly fee to Net10

7 regardless of how many phone calls you get?

8    A.  Correct.

9    Q.  And do you have a phone wifi plan?

10    A.  No.

11    Q.  How long have you used Net10?

12    A.  At least ten years.

13    Q.  So you originally got this phone number with

14 Net10?

15    A.  Yes.

16    Q.  Did you have any out-of-pocket expenses

17 associated with the phone calls that you received

18 from SolarCity?

19         MR. KRIVOSHEY:  Objection.  Form.

20         THE WITNESS:  Just standard expenses of

21 paying utilities.  I mean, you have to charge the

22 phone.  I have to take -- if I look at my phone at

23 work for this call, take time off away from working

24 for that.  I don't think any other expense.

25    Q.  (By Ms. Echtman) How much do you pay each

**Jose Albino Lucero, Jr.**                    **Morris, et al. vs. SolarCity Corp., et al.**

1  spoofed so there is no place to really call.

2      Q.  (By Ms. Echtman) What is your understanding

3  of what it means to spoof a number?

4      A.  To transmit false information about the

5  call, the phone number of the phone call, or the

6  name.

7      Q.  So you're saying when you transmit false

8  information, that the number that -- or the name or

9  number you get on the caller ID is not correct?

10     A.  Correct.

11     Q.  So what happens when you try to call back

12  that number?

13     A.  I receive a message saying that number is no

14  longer in service.

15     Q.  How many times has that happened to you?

16     A.  Many.

17     Q.  You said 95 percent of the time the number

18  is spoofed.  Can you give me an instance where you

19  call the number back and it wasn't spoofed?

20     A.  There have been no time on those ones.

21     Q.  Have you made any complaints to the FCC

22  about these spoofed numbers?

23     A.  No.

24     Q.  Why not?

25     A.  There is no information I could give the

**Page 73**

**Jose Albino Lucero, Jr.**                **Morris, et al. vs. SolarCity Corp., et al.**

1   FCC.  None of the numbers are working numbers.

2        Q.  How did you first hear about the National Do

3   Not Call Registry?

4        A.  May have been on the news when it came out.

5        Q.  Do you know what year it came out?

6        A.  No.

7        Q.  Did you sign up for the National Do Not Call

8   Registry when it first came out?

9        A.  Yes.

10       Q.  And what number did you have at that time if

11  I told you it was 2003?

12       A.  I don't remember that number.

13       Q.  And when did you put the number that you

14  currently have on the National Do Not Call list?

15       A.  I don't remember exactly.  But I believe it

16  would be right after I got the phone, that number.

17       Q.  And you thought it was about ten years ago?

18       A.  Yes.

19       Q.  And why did you do that?

20       A.  I don't like receiving telemarketing calls.

21       Q.  How often do you receive non-telemarketing

22  calls on your phone?

23       A.  How often?

24       Q.  Uh-huh.

25       A.  Maybe once a week.

Jose Albino Lucero, Jr.                    Morris, et al. vs. SolarCity Corp., et al.

```
 1      Q.   And who calls you?
 2      A.   My coworker calls me.  My aunt calls me.  My
 3 cousin calls me.  Doctors call me to remind me of
 4 appointments.
 5      Q.   Anyone else?
 6      A.   I can't remember.
 7      Q.   Okay.  Who is your coworker who calls you?
 8      A.   John Shelton.
 9      Q.   And your aunt, is this the same aunt who you
10 live with?
11      A.   Yes.
12      Q.   And what is the name of your cousin?
13      A.   Joanne Jaramillo.
14      Q.   Can you spell that?
15      A.   J-A-R-A-M-I-L-L-O.
16      Q.   Is there anyone else who you receive phone
17 calls from?
18      A.   I can't remember who else calls me.
19      Q.   Do you text?
20      A.   Yes.
21      Q.   Who do you text with?
22      A.   My coworker, my cousin.
23      Q.   Is that your cousin Joanne?
24      A.   Yes.  And another cousin.
25      Q.   What other cousin?
```

1  defendant is?

2      A.  I don't know exactly.  Something like

3  Genesis or something like that.

4      **Q.  And do you know why that company was named**

5  **in the case?**

6      A.  No, I don't know that.

7      **Q.  And do you know whether this company with**

8  **the name Genesis was dismissed from the case?**

9      A.  No, I don't know that.

10      **Q.  Are you interested to know that Mr. Morris**

11  **and the Genesis defendant are no longer in the**

12  **case?**

13          MR. KRIVOSHEY:  Objection.  Form.

14          THE WITNESS:  I have no opinion on that.

15  I'm not interested or not interested.

16      **Q.  (By Ms. Echtman) You just don't care?**

17          MR. KRIVOSHEY:  Objection.  Misstates

18  testimony.

19          THE WITNESS:  I don't not care.  I'm just

20  neutral.

21      **Q.  (By Ms. Echtman) Do you think that as a**

22  **plaintiff in a potential class action, that is**

23  **something you should know?**

24          MR. KRIVOSHEY:  Objection.  Form.

25          THE WITNESS:  Do I think that?  I haven't

1  thought it.

2     Q.  (By Ms. Echtman) Do you think you have any

3  responsibilities as a named plaintiff in a

4  potential class action?

5     A.  I believe I have some responsibilities, yes.

6     Q.  And what is your understanding what those

7  responsibilities might be?

8     A.  To participate in any proceedings to get

9  truthful and accurate information.  To represent

10  the class of people similarly situated like myself.

11     Q.  And what do you think your responsibilities

12  are to represent the class of people similarly

13  situated to yourself?

14     A.  Well, to participate in discussions with my

15  attorney or court or whoever else.

16     Q.  And what type of discussions, without the

17  content, do you think you should be having with

18  your attorney?

19     A.  What kinds?

20     Q.  Do you think you should have discussions

21  about the developments in the case?

22     A.  Yes.

23     Q.  And are you having discussions about the

24  developments in the case?

25          MR. KRIVOSHEY:  I'm going to instruct you

**Jose Albino Lucero, Jr.**                    **Morris, et al. vs. SolarCity Corp., et al.**

1  not to answer.

2  **Q.   (By Ms. Echtman) Without telling me the**

3  **content, I'm just asking whether you're having**

4  **discussions.**

5       MR. KRIVOSHEY:  That is a question about the

6  content.  You're asking about the content of our

7  conversation.  I'm going to instruct him not to

8  answer.

9       MS. ECHTMAN:  You are not going to let him

10  answer as to whether he's talked to his attorneys

11  about developments in the case, without disclosing

12  the content of the specific communications, whether

13  he has discussions with his attorneys about

14  developments in the case?

15       MR. KRIVOSHEY:  He can answer whether or not

16  he talks to his attorneys, not what about, what he

17  talks to them about.

18  **Q.   (By Ms. Echtman) Do you talk to your**

19  **attorneys?**

20  A.   Yes.

21  **Q.   How often do you talk to your attorneys?**

22  A.   There is no set pattern.  Several times.

23  **Q.   How many times?**

24  A.   I don't know the exact number.

25  **Q.   Is it more than two?**

1       A.  Yes.

2       Q.  Is it less than ten?

3       A.  Not sure on that.

4       Q.  Is there any particular frequency?

5       A.  No.

6       Q.  Are you interested to know whether one of

7   your co-plaintiffs might have settled for a

8   particular compensation?

9           MR. KRIVOSHEY:  Objection.  Asked and

10  answered.

11          THE WITNESS:  I guess, yes.

12      Q.  (By Ms. Echtman) Would it surprise you to

13  know that Mr. Morris received $75,000 from the

14  Genesis defendant?

15      A.  Would it surprise me?  No.

16      Q.  But you didn't know anything about that?

17      A.  Correct.

18      Q.  Mr. Lucero, when you received the voicemail

19  message that you listened to, did it sound to you

20  like there was a person speaking on the other end

21  of the line?

22      A.  Yes.

23      Q.  It didn't sound like a machine or a

24  computer, did it?

25      A.  No.

1      Q.  It was your impression that you were called

2   by a person?

3      A.  Yes.

4      Q.  And, in fact, you heard the person's name,

5   correct?

6      A.  Yes.  Let me rephrase.  I was -- I wasn't

7   aware that a person called me.  I was aware that a

8   person was on the line.

9      Q.  What distinction are you making?

10     A.  That it probably was on autodial.

11     Q.  But you don't know what type of telephone

12  equipment SolarCity used, do you?

13     A.  Not at all.

14     Q.  And you don't know how the call was

15  initiated, do you?

16     A.  Not at all.

17     Q.  But you listened to a voicemail message is

18  what I'm asking about.

19     A.  Yes.

20     Q.  Did you understand that that voicemail

21  message was left by a live human being?

22     A.  Yes.

23         MR. KRIVOSHEY:  Objection.  Asked and

24  answered.

25         MS. ECHTMAN:  Can we take -- this is a good

1      A.   Yes.

2      Q.   And this one shows a missed call?

3      A.   Yes.

4      Q.   And again you don't know what that means?

5      A.   Correct.

6      Q.   Did you provide your attorneys with

7    screenshots from every call that you believe you

8    received from SolarCity on your cell phone?

9      A.   As far as I could remember.  I only looked

10   in April.  There could be other calls.

11     Q.   But you don't know?

12     A.   Correct.  I don't know for sure.

13     Q.   And was it your intention to provide

14   screenshots of every call?

15     A.   Yes.

16     Q.   And are there any more screenshots that you

17   provided to your attorneys that I didn't show you?

18     A.   No.

19     Q.   Mr. Lucero, do you claim that the phone

20   calls from SolarCity did anything to degrade the

21   battery on your phone?

22     A.   Under normal wear and tear, yes.

23     Q.   How?

24     A.   Just normal wear and tear.

25     Q.   Have you had any issues with the battery in

1   your phone?

2       A.   No.

3       Q.   Have you had to replace the battery in your

4   phone?

5       A.   No.

6       Q.   Are you aware of any issues with the battery

7   in your phone?

8       A.   No.

9       Q.   Battery in your phone working properly?

10      A.   It seems to be, yes.

11      Q.   It's holding a charge when you charge it?

12      A.   Yes.

13      Q.   Have you ever had any battery issues with

14  any of your cell phones?

15      A.   Not that I can remember.

16      Q.   Is it your opinion that the phone calls from

17  SolarCity did anything to invade your privacy?

18      A.   Yes.

19      Q.   How?

20      A.   By calling me without my consent for

21  telemarketing purposes.

22      Q.   And how did that invade your privacy?

23      A.   I don't want them to call me.  They're

24  intruding on my personal life and on my work life.

25      Q.   Do you ever get calls from people that have

1   a wrong number?

2        A.   I don't believe so.

3        Q.   You've never gotten a wrong number call?

4        A.   In my life?

5        Q.   In your life.

6        A.   Probably.

7        Q.   Do you recall how many times?

8        A.   Not at all.

9        Q.   Did you think those wrong number calls

10  invaded your privacy?

11       A.   Sure.

12       Q.   How many contacts do you currently have in

13  your cell phone?

14       A.   I don't know.

15       Q.   Is it more than ten?

16       A.   Probably, yeah.

17       Q.   Is it more than 20?

18       A.   I don't know.

19       Q.   Is it more than 30?

20       A.   I don't know how many.  A bunch.

21       Q.   I think I've asked you earlier.  How many

22  people and companies do you think you've given your

23  phone number out to over the course of ten years or

24  so that you've had it?

25            MR. KRIVOSHEY:  Objection.  Asked and

**EXHIBIT R**

**CONFIDENTIAL - REDACTED**

**EXHIBIT S**

 Gmail

Al Lucero Jr. ████████████

---

# National Do Not Call Registry - OPEN AND CLICK on Link to Complete Your Registration

1 message

---

**Register@donotcall.gov** <Register@donotcall.gov>                    Tue, May 26, 2015 at 9:03 AM
To: ████████████

Thank you for completing the first step to register your phone number with the National Do Not Call Registry. Please click on the link below to complete your request to register your phone number ending in ████.

Here is the link (the link will only be available once):
https://www.donotcall.gov/register/RegConf.aspx?33FC089C-A0E6-453C-9E84-D4B4AB54BA75


Note: you must respond to this email by clicking the link within 72 hours for your registration to be successful. If you don't get a "Registration Complete" message after clicking on the link, or the link does not work, use your "copy" and "paste" functions to insert the entire link in the email into your Web browser's address bar. Once you have successfully registered, the link will no longer be active.

If you don't wish to be registered with the Do Not Call Registry, don't click on link. We won't register your number or retain your information.

*****************************************************************************************************************

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

 **Gmail**

Al Lucero Jr. ████████████████

---

# National Do Not Call Registry - OPEN AND CLICK on Link to Complete Your Registration

1 message

---

**Register@donotcall.gov** <Register@donotcall.gov>                     Fri, Jun 11, 2010 at 7:30 PM
To: ████████████████

Here is the link:
https://www.donotcall.gov/register/RegConf.aspx?ABA973FE-FF53-4BB9-A005-F3CB5EFFEE6D

Click on the link to complete your request to register your phone number with the last four digits ████ on the National Do Not Call Registry.

Important: You must respond to this email by clicking the link within 72 hours for your registration to be successful.

Important: After you click on the link, print the web page and keep it for your records.

Troubleshooting: If you don't get a "Registration Complete" message after clicking on the link, or the link does not work, use your "copy" and "paste" functions to insert the entire link in the email into the "Address" line on your Web browser. Copy and paste the entire link - it's long. Do not re-type it.

************************************************************************************************************

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

 **Gmail**

Al Lucero Jr. ██████████

---

# National Do Not Call Registry - Your Registration Is Confirmed

1 message

---

**Verify@donotcall.gov** <Verify@donotcall.gov>          Wed, Jan 6, 2016 at 6:50 AM
To: ██████████

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in ██ on June 12, 2010. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov to register another number or file a complaint against someone violating the Registry.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

**EXHIBIT T**

# BURSOR & FISHER
### P.A.

www.bursor.com

**888 SEVENTH AVENUE**
**NEW YORK, NY 10019**

**1990 NORTH CALIFORNIA BLVD.**
**WALNUT CREEK, CA 94596**

## FIRM RESUME

With offices in New York and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country.

The lawyers at our firm have an active civil trial practice, having won multi-million dollar verdicts or recoveries in five of five civil jury trials since 2008. Our most recent trial victory came in August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel and won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Verizon Wireless, AT&T Wireless, Cingular Wireless, Sprint, T-Mobile, General Electric, Haier America, and Michaels Stores as well as purchasers of Avacor™, Xenadrine™, and Sensa™ products. Since 2014, our lawyers have certified four consumer classes pursuant to contested class certification motions (*see Ebin*, *Forcellati*, *In re EZ Seed Litig.*, and *Dei Rossi infra*). Since December 2010, Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

  i.    *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

  ii.   *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

  iii.  *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

  iv.   *Loreto v. Coast Cutlery Co.* (D.N.J. Sep. 8, 2011) to represent a certified nationwide class of purchasers of knives or tools made by Coast Cutlery,

  v.    *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

vi.   *Avram v. Samsung Electronics America, Inc., et al.* (D.N.J. Jan. 3, 2012), to represent a proposed nationwide class of purchasers of mislabeled refrigerators from Samsung Electronics America, Inc. and Lowe's Companies, Inc.,

vii.   *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012), to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

viii.   *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012), to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

ix.   *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012), to represent a certified nationwide class of purchasers of Sensa weight loss products,

x.   *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers of Sinus Buster products,

xi.   *Scott v. JPMorgan Chase & Co., et al.* (S.D.N.Y. May 30, 2013) to represent a proposed nationwide class of Chase customers who were allegedly unilaterally enrolled into Chase's Overdraft Protection service and charged unauthorized fees,

xii.   *Podobedov v. Living Essentials, LLC* (C.D. Cal. Nov. 8, 2013) to represent a proposed nationwide class of purchasers of 5-hour Energy products,

xiii.   *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

xiv.   *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

xv.   *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

xvi.   *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015), to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

xvii.   *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015), to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

xviii.   *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

xix.   *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015), to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards, and

xx.   *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-state class of purchasers of Zicam Pre-Cold products.

## SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in five of five civil jury trials since 2008. Mr. Bursor's most recent victory came in August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which he served as lead trial counsel and won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict. Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury. Mr. Bursor's perfect record of five wins in five class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer. Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996. He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif. Prior to starting his own practice, Mr. Bursor was a litigation associate with Cravath, Swaine & Moore (1996-2000) and Chadbourne & Parke LLP (2001), where he represented large telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second Circuit, United States Court of Appeals for the Third Circuit, United States Court of Appeals for the Fourth Circuit, United States Court of Appeals for the Sixth Circuit, United States Court of Appeals for the Ninth Circuit, United States Court of Appeals for the Eleventh Circuit, United States District Courts for the Southern and Eastern Districts of New York, United States District Courts for the Northern, Central, Southern and Eastern Districts of California, and the United States District Courts for the Southern and Middle Districts of Florida.

### Representative Cases

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified. Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans. Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified). These settlements required Verizon and Sprint to open their wireless networks to third-party devices and applications. These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation. Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class. Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert. This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members, and ensured that the class would recover in excess of $275 million.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.* Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system. In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case. Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006. This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation*. After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement. The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, provides for a $20 million cash payment to provide

refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and includes an injunction that will reduce late fee charges by $18.6 million over 28 months.

## L. TIMOTHY FISHER

Mr. Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.  Prior to founding Bursor & Fisher, P.A. in 2011, Mr. Fisher was an associate with Bramson, Plutzik, Mahler & Birkhaeuser, LLP in Walnut Creek, California for 13 years.  During his career, he has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors.  Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud.  With his partner Scott A. Bursor, Mr. Fisher has tried four class action jury trials, all of which produced successful results.  In the initial phase of *Thomas v. Global Vision Products*, the jury awarded the plaintiff class more than $36 million plus punitive damages, while the Court awarded a $40 million recovery on separate legal claims. In a subsequent phase of the trial against individual defendants, Mr. Fisher and Mr. Bursor obtained a jury award of $50,024,611 – the largest class action award in California in 2009 and the second-largest jury award of any kind.

Mr. Fisher was admitted to the State Bar of California in 1997.  He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern and Eastern Districts of California.  Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004.  Recently, Mr. Fisher contributed jury instructions, a verdict form, and comments to the consumer protection chapter of Justice Elizabeth A. Baron's *California Civil Jury Instruction Companion Handbook* (West 2010).  In 2014, Mr. Fisher was appointed to a four-year term as a member of the Standing Committee on Professional Conduct for the United States District Court for the Northern District of California.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997.  While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States.  In 1994, Mr. Fisher received an award for Best Oral Argument in the first year moot court competition.  In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

### *Representative Cases*

- *Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor.  The case lasted more than seven years and involved two trials.  The first trial resulted in a verdict for plaintiff and the class in the amount of $40,000,000.  The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

- *In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court).  Mr. Fisher actively worked on five coordinated cases challenging the secret locking of cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems.  Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions.  The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

- *In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission).  In separate cases that are a part of the same coordinated litigation as the Handset Locking Cases, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million.  In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

- *Guyette v. Viacom, Inc.* (Alameda County Superior Court) - Mr. Fisher was co-counsel for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.  A settlement was negotiated shortly before trial under which defendants paid the class $13 million in cash.

- *In re Haier Freezer Consumer Litigation* (Northern District of California) - Mr. Fisher filed the case in June 2011 and alleged that Haier had misrepresented the energy consumption of its HNCM070E freezer on the ENERGYGUIDE labels attached to the freezers.  After two years of litigation, District Judge Edward J. Davila approved a nationwide settlement valued at $4 million, which provides for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

### *Selected Published Decisions*

- *In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010)

- *In re Cellphone Termination Fee Cases*, 180 Cal.App.4th 1110 (2009)

- *Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007)

## JOSEPH I. MARCHESE

Mr. Marchese is a Partner with Bursor & Fisher, P.A.  Mr. Marchese focuses his practice on complex business litigation, consumer class actions, and employment law disputes.  Prior to joining Bursor & Fisher, Mr. Marchese was an associate with DLA Piper and Shearman & Sterling where he litigated complex commercial matters on behalf of investment banks, pharmaceutical companies, insurance carriers, food manufacturers, and tobacco companies.

Mr. Marchese is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York, as well as the United States Court of Appeals for the Second Circuit.

Mr. Marchese graduated from Boston University School of Law in 2002 where he was a Member of The Public Interest Law Journal.  In 1998, Mr. Marchese graduated with honors from Bucknell University where he earned a B.S.B.A.

### *Representative Cases*

- *Rossi v. The Procter & Gamble Co.* (District of New Jersey) – Mr. Marchese filed the first nationwide consumer class action lawsuit alleging Crest Sensitivity Treatment & Protection toothpaste ("CSTP") was not effective as advertised, and was essentially identical to an existing brand called Crest Pro-Health toothpaste, with only three differentiating features: (1) claims of rapid relief for tooth sensitivity on the product packaging; (2) a different coloring additive; and (3) a 75% price premium over Crest Pro-Health.  The plaintiff defeated defendant's motion to dismiss before negotiating a settlement with P&G.  District Judge Jose L. Linares granted final approval of the nationwide class settlement which provides class members with a monetary refund of at least $4.00 per tube of CSTP.

- *In Re Michaels Stores Pin Pad Litigation* (Northern District of Illinois) – Mr. Marchese filed the first nationwide consumer class action against Michaels Stores concerning a data breach that resulted in the unauthorized release of customers' financial data.  He actively litigated claims that Michaels failed to secure customer personal financial data appropriately, and failed to provide adequate notice to its customers whose information and funds were stolen as a result of the breach at 86 Michaels stores across the country.  After two years of litigation, District Judge Thomas M. Durkin approved a nationwide settlement that required Michaels to create a monetary fund from which class members could receive full reimbursement for monetary losses arising from the data breach.  Also, every settlement class member was entitled to credit monitoring services for early detection of identity theft and credit fraud.  As part of the settlement Michaels also verified that it had implemented strict new security measures to protect its customers from similar data breaches in the future.

- *Cox et al. v. Clarus Marketing Group, LLC et al.* (Southern District of California) – Mr. Marchese actively litigated claims for a nationwide class of online shoppers who made purchases on Provide-Commerce websites and who were deceptively enrolled in an online service, Freeshipping.com, for which they were charged unauthorized membership fees.  The plaintiffs alleged that they were secretly enrolled in a "Freeshipping" rewards program using the aggressive Internet marketing practice known as "data pass," where Provide-Commerce engaged in the unauthorized sharing and charging of customers' billing information with a third-party vendor.  After more than two years of litigation, District Judge Marilyn L. Huff approved a nationwide settlement valued at over $2.65 million, which included monetary reimbursement to settlement class members for their unauthorized membership charges.

- *Rodriguez v. Citimortgage, Inc.* (Southern District of New York) – Mr. Marchese filed a class action lawsuit on behalf of Sergeant Jorge Rodriguez and other active duty military servicemembers alleging the lender's foreclosure practices violated the Servicemembers Civil

Relief Act, a federal law that protects military servicemembers against foreclosures while they're serving on active duty.  After two years of litigation, Judge Paul G. Gardephe approved a nationwide $38 million settlement.  Under the settlement, each servicemember that suffered a foreclosure will recover $116,785, plus the amount of any lost equity in the foreclosed property, plus interest accrued on such lost equity calculated from the date of the foreclosure sale.

### ***Selected Published Decisions***

- *In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518 (N.D. Ill. 2011) (denying motion to dismiss in data breach consumer class action)

- *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014) (certifying nationwide class of purchasers of purported "100% Pure Olive Oil" in false advertising consumer class action against edible oil distributor)

- *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015) (certifying New York and California classes in false advertising case against grass seed manufacturer)

- *Weisblum, et al. v. ProPhase Labs, Inc., et al.*, No. 14-cv-3587. --- F. Supp. 3d ---, 2015 WL 738112 (S.D.N.Y. Feb. 20, 2015) (denying motion to dismiss in false advertising consumer class action against manufacturer of homeopathic cold medicine)

## JOSHUA D. ARISOHN

Joshua D. Arisohn is a partner with Bursor & Fisher, P.A.  Mr. Arisohn focuses his practice on complex business litigation, consumer class actions, and terrorism-related matters. Prior to joining Bursor & Fisher, Mr. Arisohn was an associate at Dewey & LeBoeuf LLP and DLA Piper LLP where he litigated precedent-setting cases in the areas of mass torts, terrorism and commercial disputes.  He participated in the first ever trial to take place under the Anti-Terrorism Act, a statute that affords U.S. citizens the right to assert federal claims for injuries arising out of acts of international terrorism.

Mr. Arisohn is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Mr. Arisohn received his Juris Doctor from Columbia University School of Law in 2006, where he was a Harlan Fiske Stone Scholar.  In 2002, Mr. Arisohn received his B.A. from Cornell University.

## NEAL J. DECKANT

Neal J. Deckant is an Associate with Bursor & Fisher, P.A.  Mr. Deckant focuses his practice on complex business litigation and consumer class actions.  Prior to joining Bursor & Fisher, Mr. Deckant counseled low-income homeowners facing foreclosure in East Boston.

BURSOR&FISHER
P.A.

Mr. Deckant is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Mr. Deckant received his Juris Doctor from Boston University School of Law in 2011, graduating *cum laude* with two Dean's Awards.  During law school, Mr. Deckant served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms.  In 2007, Mr. Deckant graduated with Honors from Brown University with a B.A. in East Asian Studies and Philosophy.

## YITZCHAK KOPEL

Yitzchak Kopel is an Associate with Bursor & Fisher, P.A. Mr. Kopel focuses his practice on complex business litigation and consumer class actions.

Mr. Kopel is admitted to the State Bars of New York and New Jersey and is a member of the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, and District of New Jersey.

Mr. Kopel received his Juris Doctor from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards.  During law school, Mr. Kopel served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling.  In 2009, Mr. Kopel graduated *cum laude* from Queens College with a B.A. in Accounting.

## ANNICK M. PERSINGER

Annick M. Persinger is an Associate with Bursor & Fisher, P.A. Ms. Persinger focuses her practice on complex business litigation and consumer class actions. Prior to joining Bursor & Fisher, Ms. Persinger worked as a legal research attorney for Judge John E. Munter in Complex Litigation at the San Francisco Superior Court.

Ms. Persinger is admitted to the State Bar of California and the bars of the United States District Courts for the Northern District of California, Central District of California, Southern District of California, and Eastern District of California.

Ms. Persinger received her Juris Doctor from University of California, Hastings College of the Law in 2010, graduating *magna cum laude*.  During law school, Ms. Persinger served as a member of Hastings Women's Law Journal, and authored two published articles.  In 2008, Ms. Persinger received an award for Best Oral Argument in the first year moot court competition.  In 2007, Ms. Persinger graduated *cum laude* from University of California, San Diego with a B.A. in Sociology, and minors in Law & Society and Psychology.

## FREDERICK J. KLORCZYK III

Frederick J. Klorczyk III is an Associate with Bursor & Fisher, P.A.  Mr. Klorczyk focuses his practice on complex business litigation and consumer class actions.

Mr. Klorczyk is admitted to the State Bars of New York and New Jersey and is a member of the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, and District of New Jersey, and the United States Court of Appeals for the Second Circuit.

Mr. Klorczyk received his Juris Doctor from Brooklyn Law School in 2013, graduating *magna cum laude* with two CALI Awards for the highest grade in his classes on criminal law and conflict of laws. During law school, Mr. Klorczyk served as an Associate Managing Editor for the Brooklyn Journal of Corporate, Financial and Commercial Law and as an intern to the Honorable Alison J. Nathan of the United States District Court for the Southern District of New York and the Honorable Janet Bond Arterton of the United States District Court for the District of Connecticut. In 2010, Mr. Klorczyk graduated from the University of Connecticut with a B.S. in Finance.

## YEREMEY O. KRIVOSHEY

Yeremey O. Krivoshey is an Associate with Bursor & Fisher, P.A. Mr. Krivoshey focuses his practice on complex business litigation and consumer class actions.

Mr. Krivoshey is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern and Eastern Districts of California.

Mr. Krivoshey received his Juris Doctor from New York University School of Law in 2013, where he was a Samuel A. Herzog Scholar. During law school, Mr. Krivoshey worked as a Law Clerk at Vladeck, Waldman, Elias & Engelhard, P.C. Mr. Krivoshey also interned at the United States Department of Justice and the American Civil Liberties Union. In 2010, Mr. Krivoshey graduated *cum laude* from Vanderbilt University.

## PHILIP L. FRAIETTA

Philip L. Fraietta is an Associate with Bursor & Fisher, P.A. Mr. Fraietta focuses his practice on complex business litigation, consumer class actions, and employment law disputes.

Mr. Fraietta is admitted to the State Bars of New York and New Jersey, the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, the District of New Jersey, and the United States Court of Appeals for the Second Circuit. Mr. Fraietta was a Summer Associate with Bursor & Fisher prior to joining the firm.

Mr. Fraietta received his Juris Doctor from Fordham University School of Law in 2014, graduating *cum laude*. During law school, Mr. Fraietta served as an Articles & Notes Editor for the Fordham Law Review, and published two articles. In addition, Mr. Fraietta received the Addison M. Metcalf Labor Law Prize for the highest grade in his graduating class in the Labor Law course, and received the highest grade in his Anti-Discrimination Law & Policy course. In 2011, Mr. Fraietta graduated *cum laude* from Fordham University with a B.A. in Economics.

**EXHIBIT U**

# NATHAN & ASSOCIATES, APC

600 W. Broadway, Suite 700, San Diego, California 92101
Tel: (619)272-7014 ▪ Fax: (619)330-1819

## FIRM RESUME

### REUBEN D. NATHAN

Reuben D. Nathan received in formal education in England and obtained his Juris Doctor from Western State in 1999. Reuben D. Nathan was admitted to the State Bar of California in 2000. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California. Reuben D. Nathan has an active practice in consumer class actions and complex business litigation.  Prior to founding Nathan & Associates, APC in 2012, Reuben Nathan was the senior partner/managing partner of Azimy & Nathan, LLP a 9-person attorney firm located in Irvine, California.  Reuben Nathan has actively been involved in numerous representative actions that resulted in multi-million dollar recoveries for both employees and consumers, including, but not limited to: In re Automobile Advertising Cases, J.C.C.P 4149; *Reid v. Diedrich Coffee, Inc.*, Case No.: SACV06-888 AG; *Scerca v. Town & Country*, Case No.: SACV06-889 AG;; *Griffin v. 725 Baker, LLC,* Case No.: 30-2010-00397655; *The Parking Concepts Wage and Hour Cases*, Case No.: J.C.C.P 4531; *Leon v. Allied Exhaust Systems*, Case No.: BC438653; *De Los Santos v. Lala's Argentine Grill*, Case No.: BC472215; *Duarte v. Heroes Restaurants, Inc.,* Case No.: 30-2012-00581304; *Brihn v. PJ Orange County One, L.P.,* Case No.: 30-2010-00386818; *Gutierrez v. Umami Burger, et al*., Case No. Case No.: BC476329; *Torok v. Ameriquest*, Case No.: SACV06-892 JVS; *Strich v. Solstice Capital,* Case No.: CV05-8757 SGL*; Taylor v. Loandepot.com, llc*, et al., Case No. 30-2015-008468925.  . Reuben D. Nathan has consistently been named a Super Lawyer in the area of class action since 2012, received the legal award Class Action Lawyer of the Year, other related awards, and is a member of several legal organizations.

**EXHIBIT V**

**CONFIDENTIAL - REDACTED**

**EXHIBIT W**

**CONFIDENTIAL - REDACTED**