1  RANDALL S. LUSKEY (STATE BAR NO. 240915)
   rluskey@orrick.com
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
3  405 Howard Street
   San Francisco, California  94105
4  Telephone:  (415) 773-5700
   Facsimile:  (415) 773-5759
5
   ELYSE D. ECHTMAN (admitted *pro hac vice*)
6  eechtman@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
7  51 West 52nd Street
   New York, New York  10019-6142
8  Telephone:  (212) 506-5000
   Facsimile:  (212) 506-5151
9
   CHRISTINA GUEROLA SARCHIO (admitted *pro hac vice*)
10 csarchio@orrick.com
   JONATHAN A. DIRENFELD (admitted *pro hac vice*)
11 jdirenfeld@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
12 1152 15th Street, N.W.
   Washington, D.C. 20005
13 Telephone:  (202) 339-8400
   Facsimile:  (202) 339-8500
14
15 Attorneys for Defendant
   SolarCity Corp.

16
                    **UNITED STATES DISTRICT COURT**
17
                   **NORTHERN DISTRICT OF CALIFORNIA**
18

19
20 JOSE ALBINO LUCERO JR., on Behalf of        Case No. 3:15-cv-05107
   Himself and all Others Similarly Situated,
21                                             **DEFENDANT SOLARCITY CORP.'S**
                  Plaintiffs,                  **OPPOSITION TO MOTION FOR**
22                                             **CLASS CERTIFICATION**
            v.
23                                             **Hon. Richard Seeborg**
   SOLARCITY CORP. and LEAD GENESIS,           **Action Filed:  November 6, 2015**
24 INC.,
                                               **Hearing Date:  March 9, 2017**
                  Defendants.                  **Time:  1:30 p.m.**
25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND FACTS ................................................................................. 2

    A.    SolarCity's Customer-Friendly Business .............................................. 2

    B.    SolarCity's "No Cold Call" Commitment ............................................. 2

    C.    SolarCity's Wide Array of Lead Channels ............................................ 2

    D.    SolarCity Obtains Proper Consent to Call Its Customer Leads; These
          Consent Practices Apply to Each Lead Channel and Have Evolved Over
          Time ....................................................................................................... 3

        1.    TCPA Compliance .................................................................... 3

        2.    SolarCity's NDNC Compliance ............................................... 8

    E.    SolarCity's Telephone Systems Have Never Had the Capacity to Autodial
          Phone Numbers Without Human Intervention ........................................ 9

    F.    This Lawsuit ......................................................................................... 11

III.  LEGAL STANDARD ...................................................................................... 12

IV.   ARGUMENT .................................................................................................. 12

    A.    Plaintiff Cannot Demonstrate Commonality or Predominance ............ 13

        1.    The Diversity of Ways in Which SolarCity Obtains Consent
             Defeats Certification ................................................................ 13

        2.    Plaintiff's Proposed Subclasses Cannot Overcome Issues of
             Individualized Consent ............................................................ 17

        3.    Individualized Issues Predominate Regarding ATDS Issues ... 19

    B.    Plaintiff Cannot Demonstrate an Identifiable and Manageable Class ... 20

        1.    Plaintiff Proffers Overbroad Definitions ................................. 20

        2.    Plaintiff Cannot Demonstrate Superiority and Manageability ... 21

    C.    Plaintiff Lucero Is Neither Typical of Nor Adequate to Serve the Class ... 22

        1.    Lucero's "Wrong Party" Claim Renders Him Atypical ........... 23

        2.    A LeadiD Record Existed for Lucero's Number, Thereby Excluding
             Him From the Very Classes He Seeks to Represent ................. 24

        3.    Lucero Cannot Represent Customers and Non-Costumers ...... 24

    D.    The TCPA's Award of Monetary Damages Bars A Rule 23(b)(2) Class ... 25

V.    CONCLUSION ............................................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

5

*Abdeljalil v. Gen. Elec. Capital Corp.*,
306 F.R.D. 303 (S.D. Cal. 2015)..................................................................25

6

7

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .....................................................................................12

8

*Avio, Inc. v. Alfoccino, Inc.*,
311 F.R.D. 434 (E.D. Mich. 2015) ..............................................................16

9

10

*Baird v. Sabre Inc.*,
995 F. Supp. 2d 1100 (C.D. Cal. 2014)........................................................18

11

*Balbarin v. N. Star*,
No. 10 C 1846, 2011 WL 211013 (N.D. Ill. Jan. 21, 2011)........................16

12

13

*Banarji v. Wilshire Consumer Capital, LLC*,
No. 14-cv-2967-BEN, 2016 WL 595323 (S.D. Cal. Feb. 12, 2016) ...........24

14

15

*Barrett v. ADT Corp.*,
No. 15-cv-1348, 2016 WL 865672 (S.D. Ohio Mar. 7, 2016)................18, 19

16

*Berger v. Home Depot USA, Inc.*,
741 F.3d 1061 (9th Cir. 2014).....................................................................24

17

18

*Blackwell v. Skywest Airlines, Inc.*,
245 F.R.D. 453 (S.D. Cal. 2007)..................................................................25

19

20

*Blair v. CBE Group, Inc.*,
309 F.R.D. 621 (S.D. Cal. 2015)..................................................................15

21

*Booth v. Appstack, Inc*,
No. C13-1533JLR, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015)......16, 20

22

23

*Buonomo v. Optimum Outcomes, Inc.*,
301 F.R.D. 292 (N.D. Ill. 2014) ..................................................................23

24

25

*CE Design v. Beaty Constr., Inc.*,
No. 07 C 3340, 2009 WL 192481 (N.D. Ill. Jan. 26, 2009)........................16

26

*Chapman v. Wagener Equities, Inc.*,
No. 09 C 07299, 2014 WL 540250 (N.D. Ill. Feb. 11, 2014)......................16

27

28

*Chyba v. First Fin. Asset Mgmt., Inc.*,
No. 12-cv-1721-BEN, 2014 WL 1744136 (S.D. Cal. Apr. 30, 2014) .........24

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426, 1432 (2013) .................................................................13

*Conant v. McCaffrey*,
  172 F.R.D. 681 (N.D. Cal. 1997) ...........................................................12

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
  660 F.3d 1170 (9th Cir. 2011) ...............................................................12

*Connelly v. Hilton Grand Vacations Co.*,
  294 F.R.D. 574 (S.D. Cal. 2013) ......................................................15, 25

*Costelo v. Chertoff*,
  258 F.R.D. 600 (C.D. Cal. 2009) ...........................................................20

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .............................................................12, 23

*Faulk v. Sears Roebuck & Co.*,
  No. 11-CV-02159 YGR, 2013 U.S. Dist. LEXIS 57430 (N.D. Cal. Apr. 19,
  2013) ......................................................................................................13

*Fields v. Mobile Messengers Am., Inc.*,
  No. C 12-05160 WHA, 2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) ...................16

*G.M. Sign, Inc. v. Franklin Bank, S.S.B.*,
  No. 1:06-cv-00949, 2008 WL 3889950 (N.D. Ill. Aug. 20, 2008) .........................16

*Gannon v. Network Tel. Servs., Inc.*,
  No. CV 12-9777-RGK, 2013 WL 2450199 (C.D. Cal. June 5, 2013) ...........12, 15, 21

*Gaza v. LTD Fin. Servs., L.P.*,
  No. 8:14-CV-1012-T-30JSS, 2015 WL 5009741 (M.D. Fla. Aug. 24, 2015) .............20

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ...............................................................................23

*Gene and Gene LLC v. Biopay LLC*,
  541 F.3d 318 (5th Cir. 2008) .................................................................15

*Matter of GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited
  Declaratory Ruling Rules and Regulations Implementing the Telephone
  Consumer Protection Act of 1991*,
  29 F.C.C. Rcd. 3442 (Mar. 27, 2014) ......................................................18

*Hinman v. M & M Rental Ctr., Inc.*,
  545 F. Supp. 2d 802 (N.D. Ill. 2008) ......................................................16

*Ira Holtzman, C.P.A. v. Turza*,
  728 F.3d 682 (7th Cir. 2013) ..................................................................16

- iii -

*Knutson v. Schwan's Home Serv., Inc.*,
No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763 (S.D. Cal. Sept. 5, 2013)...........................16

*Labou v. Cellco Partnership*,
No. 2:13-cv-00844-MCE-EFB, 2014 WL 824225 (E.D. Cal. Mar. 3, 2014) .........................25

*Lee v. Stonebridge Life Ins. Co.*,
289 F.R.D. 292 (N.D. Cal. 2013) ........................................................................................16

*Lee v. Stonebridge Life Ins. Co.*,
No. 3:11-cv-00043 (N.D. Cal. Aug. 29, 2012) .......................................................................16

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
289 F.R.D. 674 (S.D. Fla. 2013) ........................................................................................16

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
No. 12-CV-04457-YGR, 2016 WL 879784 (N.D. Cal. Mar. 8, 2016) ...................................24

*Meyer v. Porfolio Recovery Assocs. LLC*,
707 F.3d 1036 (9th Cir. 2012)............................................................................................20

*Modica v. Green Tree Servicing, LLC.*,
No. 14 C 3308, 2015 WL 1943222 (N.D. Ill. Apr. 29, 2015)................................................20

*Newhart v. Quicken Loans Inc.*,
No. 9:15-CV-81250, 2016 WL 7118998 (S.D. Fla. Oct. 13, 2016)............................13, 17, 19

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) ........................................................................................12

*Pozo v. Stellar Recovery Collection Agency Inc.*,
No. 8:15-cv-00929-AEP, 2016 U.S. Dist. LEXIS 146432 (M.D. Fla. Sept. 2, 2016) ........................................................................................................................20

*Richie v. Blue Shield of California*,
No. C-13-2693 EMC, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) .......................................20

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
27 FCC Rcd. 1830 (2012) ...................................................................................................17

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
30 FCC Rcd. 7961 (2015) ...................................................................................................19

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009)...............................................................................................18

*Saulsberry v. Meridian Fin. Servs., Inc.*,
No. CV 14 6256 JGB, 2016 WL 3456939 (C.D. Cal. Apr. 14, 2016) .....................................24

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-cv-05107

*Selby v. LVNV Funding, LLC,*
   No. 13-cv-01382, 2016 WL 6677928 (S.D. Cal. June 22, 2016)..............................................18

*Simon v. Healthways, Inc.,*
   No. CV 14-08022-BRO, 2015 WL 10015953 (C.D. Cal. Dec. 17, 2015) ...............................15

*Sosna v. Iowa,*
   419 U.S. 393 (1975) ..................................................................................................................23

*Southwell v. Mort. Inv'rs Corp. of Ohio, Inc.,*
   No. C13-1289 MJP, 2014 WL 3956699 (W.D. Wash. Aug. 12, 2014)..................................22

*Stern v. DoCircle, Inc.,*
   No. SACV 12-2005 AG, 2014 WL 486262, at *3 (C.D. Cal. Jan. 29, 2014)..........................16

*Strauss v. CBE Grp., Inc.,*
   173 F. Supp. 3d 1302 (S.D. Fla. 2016) ...................................................................................20

*Sueoka v. United States,*
   101 F. App'x 649 (9th Cir. 2004) .............................................................................................23

*Torres v. Mercer Canyons Inc.,*
   835 F.3d 1125 (9th Cir. 2016)..................................................................................................21

*True Health Chiropractic, Inc. v. McKesson Corp.,*
   No. 13-cv-02219-HSG, 2016 U.S. Dist. LEXIS 111657 (N.D. Cal. Aug. 22,
   2016) .........................................................................................................................................15

*Vigus v. So. Ill. Riverboat/Casino Cruises, Inc.,*
   274 F.R.D. 229 (S.D. Ill. 2011)................................................................................................21

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011)...........................................................................................................12, 25

*Warnick v. Dish Network LLC,*
   301 F.R.D. 551 (D. Colo. 2014)...............................................................................................22

*Whitaker v. Bennett Law, PLLC,*
   No. 13-cv-3145-L(NLS), 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014) .................................16

*In re Yahoo Mail Litig.,*
   7 F. Supp. 3d 1016 (N.D. Cal. 2014) .......................................................................................18

*Zinser v. Accufix Research Inst., Inc.,*
   253 F.3d 1180 (9th Cir. 2001)..................................................................................................13

**Statutes**

47 U.S.C. § 227(b)(3)(B) ..............................................................................................................25

1

**Other Authorities**

2

47 C.F.R. § 64.1200(a)(2) ..............................................................................3, 5

3

47 C.F.R. § 64.1200(c)(2) ..............................................................................5, 9

4

47 C.F.R. § 64.1200(f)(5) ...................................................................................5

5

Rule 23 ........................................................................................................12, 22

6

Rule 23(a) ...................................................................................................12, 22

7

Rule 23(a)(3) ....................................................................................................23

8

Rule 23(b) ..........................................................................................................12

9

Rule 23(b)(2) ...............................................................................................12, 25

10

Rule 23(b)(3) ......................................................................................................12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.      INTRODUCTION**

2            Plaintiff's whole case is premised on the hope and gamble that SolarCity has engaged in

3    the type of telemarketing conduct that would justify a class recovery in the millions of

4    dollars.  Not so.  SolarCity's business model is distinct, and based on customer-friendly outreach

5    that guarantees that the company's telemarketing practices are made solely in response to

6    affirmative consumer inquiries, and with proper consent.  These consumer inquiries come to the

7    company through myriad and distinct marketing channels.  And the methods that SolarCity

8    employs in each marketing channel to obtain consent from each consumer are equally

9    varied.  These diverse channels and consent practices make it impossible to resolve, without

10   conducting an individual inquiry for each customer lead SolarCity obtained, the most

11   fundamental question at issue in this TCPA case:  whether a class member consented to receive

12   telemarketing calls.

13           Add to this impossibility the fact that Plaintiff's case is unraveling.  The two primary class

14   representatives abandoned their claims against SolarCity, and now Jose Albino Lucero Jr. is the

15   lone remaining class representative.  But he is a "wrong number" Plaintiff whose number

16   SolarCity had express written consent to call.  Moreover, following SolarCity's production of

17   nearly one million written consent records, Plaintiff has been forced to amend his class definition,

18   proposing for the first time here new classes and subclasses that he hopes can circumvent

19   SolarCity's evidence of consent.  All to no avail.  Plaintiff's amended classes still include

20   countless consenting consumers who opted-in to receiving calls when they visited websites (like

21   SolarCity.com and other sites operated by third-parties); met with SolarCity sales agents at retail

22   stores like The Home Depot; and responded to direct mailings by calling SolarCity's 1-888

23   number.  The classes also still include SolarCity's customers, and consumers called within the 3-

24   month exemption period following a consumer inquiry.  Given these unpalatable facts, and the

25   overwhelming evidence of individualized consent, Plaintiff's gamble on a certified TCPA class

26   cannot be allowed to pay off.  Plaintiff's request for certification of any of his proposed classes

27   should be denied.

28

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

## II.    BACKGROUND FACTS

### A.    SolarCity's Customer-Friendly Business

Founded in 2006, SolarCity has become the leading solar energy company in the United States.  ECF No. 25-2.  SolarCity sells, designs, installs, and finances solar photovoltaic energy systems to homeowners, businesses, schools, nonprofits, and government organizations for a lower price than the electricity utilities provide.  *Id.*  In the decade since the company's founding, both the solar industry and SolarCity itself have grown dramatically:  SolarCity has increased in size from just a few customers in a few states to several hundred thousand in over 25 states.

### B.    SolarCity's "No Cold Call" Commitment

SolarCity does not make telemarketing cold calls and never has.  Raymond Decl. ¶ 3. SolarCity's consumer business relies on convincing customers to enter into long-term (typically twenty-year) contracts to purchase the electricity their solar energy systems produce.  *Id.* ¶ 4. Obtaining those customer relationships is easiest when a customer affirmatively welcomes SolarCity's contact.  *Id.*  Moreover, cold-calling consumers makes no economic sense.  *Id.* ¶ 5. SolarCity's customers must reside in a state where SolarCity does business, own the home where the solar energy system will be installed, have a roof that can support the system, have sufficient access to sunlight to justify installing a solar energy system, and customers must pay tens of thousands of dollars upfront, or satisfy credit requirements.  *Id.*

Thus, SolarCity only calls prospective customers who have expressed an interest in going solar.  *Id.* ¶ 3. To that end, SolarCity uses a variety of different marketing channels to explain its value proposition to the public and to generate interest in its products.  *Id.*  Prospective customers can use these lead channels to request information and to voluntarily provide their contact information.  *Id.* ¶ 3.  Only after a customer affirmatively inquires (known as a customer "lead"), will SolarCity's sales agents follow up with a call.  *Id.* ¶¶ 3, 6.

### C.    SolarCity's Wide Array of Lead Channels

The marketing channels (*i.e.*, "lead channels") SolarCity uses to generate customer leads are numerous.  Sebenius Decl. ¶ 2.  These lead channels have changed over time, reflecting the company's pursuit of different growth strategies.  *Id.*  Since 2011, SolarCity has obtained

customer leads through at least nine different lead channels.[1]  *Id.*  While all of these lead channels generated leads that SolarCity's sales agents called during the relevant time period, five generated the majority of leads:  (1) third-party lead generators; (2) the SolarCity website; (3) third-party online/internet search platforms; (4) direct mail advertisements; and (5) partner stores (*e.g.*, The Home Depot and Best Buy).  *Id.* ¶ 3.  Each lead channel is distinct, each channel procures consent for telemarketing calls in different ways, and each has had substantial variation (e.g., by volume and overall share of company leads per channel) over the course of the proposed class period.  *Id.*

### D. SolarCity Obtains Proper Consent to Call Its Customer Leads; These Consent Practices Apply to Each Lead Channel and Have Evolved Over Time

During the proposed class period, SolarCity employed a variety of compliance procedures to ensure that it had the necessary consumer consent under the TCPA, the National Do Not Call Registry ("NDNC"), and other laws, prior to placing a sales call.  *Id.* ¶ 25.  These compliance procedures have evolved over time, as the company has grown, added lead channels, entered new states with varying laws, and as the relevant federal standards changed.[2]

#### 1. TCPA Compliance

The TCPA requires that a company secure "express written consent" for telemarketing calls made after October 16, 2013, to consumers' wireless phone numbers using an autodialer system ("ATDS").  47 C.F.R. § 64.1200(a)(2).  SolarCity does not now and has never used an autodialer when making sales calls.  *See infra* Section II-E.  Nonetheless, SolarCity's compliance practices guarantee that each lead channel meets the TCPA's wireless consent standards.

**Lead Generator Channel Consent Practices**:  Lead generators are third-party businesses that independently contract with SolarCity to provide it with customer leads that are compliant

---

[1] The lead channels have included some combination of the following: (1) third-party lead generators; (2) the SolarCity website; (3) third-party online/internet search platforms; (4) direct mail advertisements; (5) partner stores (e.g., The Home Depot and Best Buy); (6) SolarCity's "1-888" customer number; (7) sponsored in-person events (such as solar "open houses"); (8) mall kiosks; and (9) radio/TV advertisements.  *Id.* ¶ 2.

[2] For instance, since late 2015 SolarCity sales agents have participated in an intensive two week new employee training session on the TCPA and NDNC requirements and SolarCity's compliance software and systems.  *Id.* ¶ 25; Sarchio Decl. Ex. P, Raymond Dep. 23:21-24:23, 27:14-25.  Sales agents continue to have regular quarterly refresher training on the company's TCPA and DNC policies and procedures.  *Id.*

1  with the TCPA ("qualified leads").  Sebenius Decl. ¶¶ 4-7.  These third-party lead generators

2  create leads by owning and operating independent websites that advertise the benefits of going

3  solar and invite consumers to volunteer their contact information to receive information from a

4  solar provider like SolarCity.  *Id.* ¶ 4.  Once a consumer volunteers his information, the lead

5  generator sells that qualified lead to SolarCity.  *Id.*  Lead generators often sell each lead to

6  multiple solar companies.  *Id.*  Further, many lead generators have relationships with affiliates

7  that in turn operate their own independent websites and generate their own customer leads.[3]  *Id.*

8  SolarCity has always demanded compliance with the TCPA on the issue of consent.  *Id.* ¶¶ 7-17.

9      Since November 2015, SolarCity also has tracked consent for the Lead Generator Channel

10  through a cloud-based technology platform called LeadiD.  *Id.* ¶ 11.  LeadiD requires lead

11  generators to provide electronic proof of express written consent for each lead submitted.  *Id.*

12  LeadiD confirms TCPA compliance by reviewing and recording the electronic consent

13  information submitted with each lead, and then assigning an authentication number ("token"

14  number) to that lead, which token number is then recorded and used for tracking and storing proof

15  of consent.  Sebenius Decl. ¶ 12.  LeadiD works in connection with a software application from

16  Gryphon Networks ("Gryphon"), an add-on to SolarCity's Salesforce platform, to confirm that

17  the lead provided express written consent.[4]  Sebenius Decl. ¶ 27.  No customer lead can be

18  uploaded to SolarCity's "Salesforce" platform or routed to a sales agent for a telemarketing or

19  other call unless the lead is first given an authenticated LeadiD token.  Sarchio Decl. Ex. Q,

20  Sebenius Dep. 30:1-33:1.

21

22  [3] As an example, one of SolarCity's largest contracted lead generators, Modernize, had its own
   independent contracts with approximately 420 different affiliates, each of which managed its own

23  distinct websites over the course of the proposed class period.  Polka Decl. ¶ 9.

24  [4] SolarCity uses the Salesforce software platform to store the names, addresses, and telephone
   numbers of consumers who have expressed interest in SolarCity's products.  Sebenius Decl. ¶ 2.
   Gryphon, adopted by the company in November 2015, is used to automatically check the listed

25  number of every customer lead against state, federal, and internal Do-Not-Call registries and
   wireless databases.  Sebenius Decl. ¶ 27.  When a customer lead is associated with a wireless or

26  DNC number, Gryphon then confirms a record of express written consent (via an "Ok to Call"
   visual) before the customer lead is manually called.  *Id.*  Gryphon checks telephone databases and

27  confirms a written consent record for every lead channel, regardless of consent method (e.g., it
   confirms consent records via LeadiD for the Lead Generator channel, and via the Lead Capture

28  Form for the Partner Channel).  *Id.*

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-cv-05107

SolarCity's lead generators generally obtain TCPA consent from prospective customers in two ways.  First, through proof of a consumer's completed website consent form (an "opt-in" form) that contains TCPA compliant disclosures.  Sebenius Decl. ¶¶ 11-14.  (Since November 2015, if a lead generator obtains consent through a website consent form, LeadiD transmits a record of the opt-in event to SolarCity.)  Second, through a telephone voice recording that confirms the consumer's consent to be called in response to TCPA compliant disclosures. Sebenius Decl. ¶ 17.  If a lead generator obtains consent by voice recording, the LeadiD visual playback will capture the script the lead generator representative reads to the consumer, and the lead generator will maintain an audio copy of the consumer's voice recording consent.  *Id.*

But since each lead generator uses its own opt-in form, as does each of its third-party affiliates, the language in the forms (or in the TCPA script read over the phone) varies greatly.[5] Sebenius Decl.¶ 13.  For instance, some forms expressly ask consumers to opt-in to calls from "SolarCity," while others ask consumers if they would agree to be called by various "home services companies"—such as "up to five solar companies"—without specifically naming SolarCity but providing a hyperlink that allows the consumer to click through to a web page listing that does define SolarCity as one of the "solar companies" or "home services companies" or "service providers" referenced.[6]  *Id.* ¶¶ 14-15; Duband Decl. ¶ 10.

Prior to LeadiD's November 2015 rollout, SolarCity required its lead generators to comply with TCPA, NDNC, and other consent obligations through its contracts,[7] as well as thorough review and approval of the various lead generators' TCPA consent language.  *Id.* ¶¶ 7-11.  SolarCity also monitored individual leads to ensure TCPA compliance.  Sarchio Decl. Ex. G,

---

[5] Through the class period, SolarCity's lead generator partners used at least 140 different variations of consent language.  *Id.* ¶ 13.

[6] It is impossible to determine in any uniform manner whether a hyperlinked page expressly names SolarCity since LeadiD captures only the plain text of the disclosure and does not show an active hyperlink, and for many of the LeadiD consent forms, the hyperlink has since expired so the website may no longer show what companies are named.  *Id.* ¶ 15.

[7] While SolarCity has always demanded that its lead generator partners obtain consent, SolarCity does not actually *need* express written consent to make sales calls because 1) SolarCity does not use an autodialer to make telemarketing calls to cell phones (47 C.F.R. § 64.1200(a)(2)); and (2) SolarCity merely responds to consumer inquiries and therefore has a three-month window under the applicable National Do Not Call Registry laws (47 C.F.R. § 64.1200(c)(2) and (f)(5)).

1    Van Tricht Dep. 32:19-33:8.   At all times, SolarCity's contracts, which have varied, also required

2    lead generators themselves to maintain records of each consumer's consent.  *Id.*; Sebenius Decl.

3    ¶¶ 7-10; Duband Decl. ¶¶ 4, 9, 16, 19; Polka Decl. ¶¶ 3, 8, 11, 14.  These pre-LeadiD consent

4    records are currently maintained by the individual lead generators.  For example, Modernize—

5    SolarCity's largest provider of leads—maintains records of express written consent for pre-

6    LeadiD leads it sold to SolarCity that originated from websites Modernize operated.   Polka Decl.

7    ¶¶ 5-8 (consent records for 80,000 leads from home-solar-rebates.com; 11,000 leads from

8    findsolarrebates.com; 37,000 leads from homesolarinstallation.net).  Lead Genesis, another large

9    provider of leads to SolarCity, maintains "Certificates of Opt-ins" that document when each

10   consumer submitted an inquiry to Lead Genesis's database as well as a copy of the web pages

11   containing each consumer's TCPA consent.  Duband Decl. ¶¶ 8-12 (attaching consent records

12   from a small sampling of Lead Genesis websites, including SolarSavingsAmerica.com,

13   TheNationalSolarNetwork.com, and SolarJoy.com, among others).

14        Plaintiff correctly notes that from time to time SolarCity received complaints directly

15   from prospective customers regarding calls from lead generators purportedly on behalf of

16   SolarCity.  SolarCity's practice on these occasions was to investigate the lead, review the

17   evidence of consent, listen to the call recording, examine the call to determine the cause of the

18   complaint, and implement any needed remedial measures with the lead generator to correct the

19   issue, if any.[8]  Sarchio Decl. Ex. G, Van Tricht Dep. 148:1-14.  SolarCity concluded that many of

20   those complaints were caused by consumers either not remembering that they or a family member

21   had requested information, or confusing a call from a different "solar" company as being from

22   SolarCity.[9]  Raymond Decl. ¶ 8.

23

---

24   [8] The original plaintiff in this case, George Morris complained of autodialed and robocalls by a
     lead generator, which he later joined in this lawsuit.  While Morris subsequently dismissed his
25   claims, SolarCity has endeavored to take his deposition to defend against the allegations still
     pending against it.  Morris unilaterally cancelled his scheduled deposition, counsel refused to
26   reschedule, ECF No. 95, and Morris evaded service of a subpoena until recently, despite the fact
     the Magistrate acknowledged the relevance of his testimony to the class certification issues
27   pending before this Court.  (ECF No. 97 at 2.)  SolarCity reserves the right to seek to supplement
     its opposition brief once the issue of Morris' deposition has been resolved.

28   [9] Indeed, the FTC and DOJ recently sued unethical companies that engage in the type of
     robocalling and TCPA violations alleged here, and further "spoof" the calls by transmitting phony

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

SolarCity had contracts with at least 35 different lead generator partners during the class period. Sebenius Decl. ¶ 5. However, it was not until 2015 that SolarCity began purchasing any significant number of leads from lead generators: SolarCity only purchased 5,659 leads from lead generators in 2011, compared with 897,525 leads purchased from lead generators in 2016. *Id.*[10]

**SolarCity.com and Online/Search Channel Consent Practices**: SolarCity owns and operates SolarCity.com and more than twenty other internet "landing" pages—online SolarCity web pages to which consumers are directed when they perform an internet search for SolarCity, or when a consumer clicks on digital SolarCity advertisements hosted on third-party websites. *Id.* ¶ 18. Through both SolarCity's proprietary website and its landing pages, consumers can enter their contact information, including telephone number, and request a quote for solar products. *Id.* ¶ 19. By submitting their information, consumers agree to SolarCity's Terms of Use. Sarchio Decl. Exs. S, T. Since April 2014, SolarCity's Terms of Use have included a binding arbitration clause and class action waiver. Sarchio Decl. Ex. S. Once this lead information is submitted, SolarCity's sales agents follow up with a call.

SolarCity's website and landing pages state: "By clicking here, I agree that SolarCity can contact me via automated technology and/or pre-recorded messages using the number provided. I understand that this consent is not required to make a purchase." *Id.* From 2011 to 2016, SolarCity's proprietary website and landing pages underwent numerous iterations; the TCPA disclaimer's presence and wording also changed over time. *Id*. ¶ 19. During this time period, this lead channel also increased significantly in volume—from 36,489 leads in 2011 to 284,674 in 2016. *Id.* ¶ 20.

**Direct Mail Channel Consent Practices**: During the proposed class period, SolarCity and its marketing partners conducted several direct mail campaigns, in which SolarCity sent

---

caller ID information. SolarCity believes that a significant proportion of these and internet complaints are attributable to companies engaging in such fraudulent conduct. *See* Andrew Johnson, Scammers can fake caller ID info, Federal Trade Commission (May 4, 2014), https://www.consumer.ftc.gov/blog/scammers-can-fake-caller-id-info; United States Files Suit Against California Telemarketers to Halt Unlawful Robocalls Promoting Solar Panel Sales, Justice News (March 10, 2016), https://www.justice.gov/opa/pr/united-states-files-suit-against-california-telemarketer-halt-unlawful-robocalls-promoting.

[10] SolarCity produced LeadiD records showing consent for over 870,000 leads. *Id.* ¶ 13.

1    information to consumers, inviting them to call SolarCity directly to learn more about the

2    company's products many consumers did.  *Id.* ¶ 22.  SolarCity began conducting extensive direct

3    mail marketing campaigns in late 2013 and continued the campaigns through the first part of

4    2016.  *Id.*  As a result of these campaigns, SolarCity received and called 77,803 leads from its

5    direct mail advertisements, with 67,704 of those leads coming in 2014 and 2015.  *Id.* ¶ 24.

6         When a consumer calls SolarCity, an inbound sales agent answers the call; discloses that

7    SolarCity is recording the call; verifies the consumer's contact and other information; and

8    requests verbal TCPA-compliant consent from the consumer to receive further telemarketing

9    calls.  *Id.* ¶ 23.  SolarCity maintains a copy of this recording with the consumer's consent.  *Id.*

10        **Partner Store Channel Consent Practices**:  SolarCity has agreements with retailers,

11   such as The Home Depot and Best Buy, for SolarCity sales agents to set up booths to display

12   solar-related information and answer questions from store customers about SolarCity's products.

13   *Id.* ¶ 21.  Sales agents obtain TCPA consent from prospective customers who come through the

14   Partner Store lead channel through SolarCity's "Lead Capture Form."  *Id.*  If an in-store consumer

15   expresses interest, the sales agent will open a "Lead Capture Form" on the agent's tablet and have

16   the consumer enter his or her contact information, including telephone number.  *Id.*  The Lead

17   Capture Form includes the following disclosure:

18
19        By clicking below, I agree that SolarCity can contact me for telemarketing and
         informational purposes via call or text using automated technology. . . [at] the
         number provided.  I understand that consent is not a condition of purchase.  *Id.*
20

21        When a Lead Capture Form is submitted via the in-store sales agent's tablet, a customer

22   lead entry is created in SolarCity's Salesforce platform, but no LeadiD record is generated.  *Id.*;

23   Sarchio Decl. Ex. Q, Sebenius Dep. 52:11-24.  Lead Capture Forms with disclosure language

24   have been utilized in the Partner Store lead channel since January 19, 2016.  Sebenius Decl. ¶ 21.

25   Prior to this date, in-store SolarCity representatives still used Lead Capture Forms—and still

26   required consumers to voluntarily submit their contact information for further follow up.  *Id.*

27              **2.    SolarCity's NDNC Compliance**

28        For each of its lead channels, SolarCity also obtained consent for all consumers listed on

- 8 -

the National Do Not Call Registry.  SolarCity obtains NDNC consent in one of two ways: (1) via the same consent methods described above to obtain express written consent under the TCPA's wireless consent standards; or (2) by making follow-up sales calls to customer leads within three months of a consumer's original inquiry, regardless of the originating lead channel.  Sebenius Decl. ¶¶ 7-24; Raymond Decl. ¶ 3.  *See* 47 C.F.R. § 64.1200(c)(2) and (f)(5).

Regardless of how SolarCity obtains NDNC consent for a particular customer lead, SolarCity treats each customer lead the same if a consumer subsequently tells a SolarCity agent that he no longer wishes to be contacted.  In this event, the agent is trained to place the consumer on SolarCity's "Internal Do Not Call" ("IDNC") list by checking the "DNC" box on the consumer's Salesforce record.  Sebenius Decl. ¶ 26.

Prior to November 2015, SolarCity required sales agents to compare each customer lead against Salesforce to determine that the consumer was not on the IDNC list prior to calling.  *Id.* After November 2015, SolarCity used Gryphon to automatically check the listed number of every customer lead against state, federal, and internal Do-Not-Call registries before a human being made the decision to place a sales call.  *Id.*

**E.      SolarCity's Telephone Systems Have Never Had the Capacity to Autodial Phone Numbers Without Human Intervention**

When calling customer leads, SolarCity's sales team has used a variety of telephone systems with distinct capabilities and diverse hardware and software configurations over the class period.  *See* Rosenberg Decl. ¶¶ 2-7.  None of these telephone systems had the ability to autodial telephone numbers without a live sales representative manually placing each call.  *Id.*

From November 2011 through early 2012, SolarCity's sales team utilized an Asterisk-Xorcom telephone system that ran Asterisk software Version 1.4 and FreePBX 2.6.  *Id.* ¶ 2.  From early 2012 through December 2013, SolarCity's sales team used the Asterisk-based Securus telephone system, which ran Asterisk software Version 1.8.  *Id.* ¶ 3.  Both of these Asterisk systems required sales representatives to use their fingers to dial each phone number into a hard phone on their desks.  *See* Sarchio Decl. Ex. P, Raymond Dep. 165:2-6.  SolarCity's sales team never purchased or used an Asterisk system that could dial phone numbers by itself, without a

1  human initiating each call.  Rosenberg Decl. ¶ 4.

2         From December 2013 until June 2016, SolarCity used various versions of the Mitel

3  Communications Director ("MCD") telephone system.  *Id.* ¶ 5.  None of the MCD products could

4  autodial phone numbers without a human initiating the call.  *Id.* ¶ 6.  Every sales call SolarCity

5  made during this period was placed by a live sales agent dialing each number into a physical

6  phone on his or her desk.  *Id.*; Sarchio Decl. Ex. P, Raymond Dep. 193:22-25.  While Mitel

7  offered a product that was capable of autodialing phone numbers, "SolarCity chose not to

8  purchase that particular product."  Sarchio Decl. Ex. P, Raymond Dep. 191:12-15; Rosenberg

9  Decl. ¶ 6.

10        Since November 2015, SolarCity has used a Genesys Business Edition Cloud 8.5.0

11 system.[11]  Rosenberg Decl. ¶ 7.  This system uses a "soft phone environment," which allows sales

12 agents to manually "click to dial" phone numbers on their computer screens.  Sarchio Decl. Ex. P,

13 Raymond Dep. 218:8-219:4.  The Genesys Business Edition Cloud system could not dial phone

14 numbers by itself, without human intervention.  Rosenberg Decl. ¶ 7.  Genesys marketed a

15 different telephone system, Genesys Outbound Engage, that could automatically dial numbers,

16 but again SolarCity chose not to purchase that product.  *Id.*

17        SolarCity's wireless telecommunications expert, Ray Horak, performed an individualized

18 evaluation of each of the Asterisk-Xorcom, Asterisk-Securus, Mitel MCD, and Genesys Business

19 Edition Cloud telephone systems that SolarCity's sales teams used during the class period and

20 concluded that *none* of these systems were capable, at the time they placed the calls at issue, of

21 dialing phone numbers without human intervention.  *See* Horak Decl. ¶¶ 67-71.

22        Plaintiff's expert, Randall Snyder, asserts that each of SolarCity's telephone systems had

23 the potential capability to function as an ATDS because the manufacturers of each system *offered*

24 autodialing functionality, even if SolarCity chose not to purchase those products.  Sarchio Decl.

25 Ex. H, Snyder Dep. 109:4-110:19, 129:16-19, 136:7-12, 194:16-21, 197:18-23, 211:16-21,

26 212:14-16, 217:16-22, 231:15-17, 232:18-233:6, 233:21-234:2.  That is nonsense.  Snyder's

27
───────────────
[11] The Mitel MCD system and the Genesys Business Edition Cloud system overlapped between
28 November 2015 – June 2016.  Rosenberg Decl., ¶¶ 5, 7.

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

1    "expert" opinions should be excluded for the reasons set forth in SolarCity's motion to exclude

2    his testimony (ECF No. 97), just as they have been in two prior cases.

3        **F.**      <u>**This Lawsuit**</u>

4          On November 6, 2016, serial TCPA litigant George Morris sued SolarCity on behalf of

5    himself and a purported class, claiming he received an unsolicited call from a lead generator

6    offering solar services.  (ECF No. 35 at 3.)   Jose Albino Lucero Jr. and David Hall were added to

7    the case, though Morris and Hall have since dismissed their cases.  (ECF Nos. 90, 91.)

8          The sole remaining plaintiff, Lucero, claims to be a victim of happenstance.  On April 11,

9    2016, an individual claiming to be named Phil Benavidez went online to Solar.Comparisons.org,

10   a website operated by a lead generator, DoublePositive. Sebenius Decl. ¶ 14.   Benavidez filled

11   out a form on the website expressing interest in purchasing solar panels for his house.  *Id*.  He

12   entered his phone number as (505) 205-8750 and authorized SolarComparisons and up to four

13   home service companies to call him using autodialed calls.  *Id*.  The term "<u>home service</u>

14   <u>companies</u>" contained a hyperlink directing Benavidez to a page specifically listing SolarCity as

15   one of the companies.  *Id*. ¶¶ 14-15.  The phone number entered by "Phil Benavidez" purportedly

16   belonged to Plaintiff Lucero.  Sarchio Decl. Ex. I, Lucero Dep. 165:3-9.

17         Later that same day, DoublePositive provided this lead to SolarCity with evidence of

18   consent captured in a LeadiD record.  Sarchio Decl. Exs. B, D (LeadiD record associated with

19   Lucero's cellular phone number).   A SolarCity sales agent received the lead, confirmed through

20   the Gryphon compliance software that SolarCity had express written consent to call the number

21   (505) 205-8750, and manually dialed the number.  Sarchio Decl. Ex. B.  The initial call went

22   unanswered, and the agent left a voice message stating that he was responding to a recent inquiry.

23   Sarchio Decl. Ex. E.  The agent called back later that same day and then left another voice

24   message on April 13, 2016, for Benavidez.  Sarchio Decl. Ex. F.  SolarCity subsequently tried to

25   follow up on three occasions, but neither Benavidez, Lucero, nor anyone else ever answered or

26   returned these calls, and SolarCity never called this number again.  Sarchio Decl. Ex. B.

27         Lucero admits he had no interaction with SolarCity.  Sarchio Decl. Ex. I, Lucero Dep.

28   45:18-25.  He further testified that he does not know Phillip Benavidez.  *Id.* at 80:22-23; 174:8-

1    175:8.  Lucero, however, admitted that he at times used a "made-up" name to avoid using his real

2    name, and he could not recall how many different times he has used a fake name.  *Id.* at 121:6-24;

3    123-14-16.  As a result, SolarCity asked to conduct a forensic examination of his cell phone and

4    laptop, to which Lucero has still not agreed. Sarchio Decl. Ex. A.

5    **III.     LEGAL STANDARD**

6            Before certifying a class, a court must conduct "a rigorous analysis" of the Rule 23

7    prerequisites.  *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

8    The party seeking certification bears the burden of showing numerosity, commonality, typicality,

9    and adequacy of representation.  Rule 23(a); *see also, e.g., In re Optical Disk Drive Antitrust*

10   *Litig.*, 303 F.R.D. 311, 315 (N.D. Cal. 2014).  "The failure to carry this burden as to any one of

11   the requirements precludes the maintenance of the lawsuit as a class action."  *Conant v.*

12   *McCaffrey*, 172 F.R.D. 681, 691 (N.D. Cal. 1997).  Moreover, the plaintiff must provide a

13   workable class definition by showing that the members of the class are identifiable and

14   ascertainable.  *Gannon v. Network Tel. Servs., Inc.*, No. CV 12-9777-RGK, 2013 WL 2450199, at

15   *2 (C.D. Cal. June 5, 2013).  A plaintiff must also demonstrate that the class satisfies Rule 23(b).

16   *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011).  Lucero seeks certification

17   pursuant to Rule 23(b)(2) and Rule 23(b)(3).  Under Rule 23(b)(2), plaintiffs must prove that

18   monetary relief is merely "incidental to the injunctive or declaratory relief" claim.  *Wal-Mart*

19   *Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).  Rule 23(b)(3) requires proof that questions

20   "common to class members predominate over *any* questions affecting only individual members."

21   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

22   **IV.     ARGUMENT**

23           No class can be certified here.  First, Plaintiff cannot establish commonality or

24   predominance given the number of individual issues within each of the proposed classes,

25   including the various ways members of the putative classes consented to the calls and the

26   different systems SolarCity used to manually dial numbers.  Second, the proposed class

27   definitions are impermissibly overbroad, as they encompass individuals who consented to calls

28   from SolarCity, including current customers, and improperly require the Court to investigate the

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

1   manner in which each potential class member consented to receiving calls.  Third, not only are

2   Plaintiff's claims wildly atypical of the classes he purports to represent, but he does not even

3   appear to be a *member* of any of the subclasses he proposes.  Finally, Plaintiff's effort to avoid

4   the fatal problems with his 23(b)(3) class by asserting a 23(b)(2) class for injunctive relief fails

5   because Plaintiff is primarily seeking monetary damages.  Thus, certification is not proper.

6   ### A.   Plaintiff Cannot Demonstrate Commonality or Predominance

7       In *Comcast Corp. v. Behrend*, the Supreme Court reiterated that a plaintiff seeking to

8   certify a class bears a heavy burden of demonstrating through "evidentiary proof" that questions

9   "common to class members *predominate over* any questions affecting only individual members."

10  133 S. Ct. 1426, 1432 (2013) (emphasis added); *see also Faulk v. Sears Roebuck & Co.*, No. 11-

11  CV-02159 YGR, 2013 U.S. Dist. LEXIS 57430, at *23 (N.D. Cal. Apr. 19, 2013).  Where

12  resolution of a case "require[s] the separate adjudication of each class member's individual claim

13  or defense," class treatment is inappropriate.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d

14  1180, 1189 (9th Cir. 2001) (quotations and citation omitted).

15  ### 1.   The Diversity of Ways in Which SolarCity Obtains Consent Defeats Certification

16

17      Given the myriad ways consumers consented to receive calls from SolarCity, Plaintiff

18  cannot demonstrate that evidence of consent is similar, much less uniform, across either the

19  Autodialer or NDNC classes.  Rather, resolving the consent issue will depend upon "multiple

20  layers of individualized evidence about each call and the circumstances that preceded it."

21  *Newhart v. Quicken Loans Inc.*, 2016 WL 7118998, at *2 (S.D. Fla. Oct. 13, 2016).

22      The Lead Generator Channel alone illustrates the magnitude of the problem.  SolarCity

23  purchased leads from 35 lead generators—or one of their hundreds of affiliates—across the class

24  period.  For each lead, a consent inquiry (for both Autodialer and NDNC classes) must evaluate:

25  (1) the date(s) of the alleged call(s) (to determine whether LeadiD or a pre-LeadiD form of

26  consent method was in place); (2) whether the consumer provided consent through a web form or

27  a compliant phone call; (3) the specific consent language the consumer agreed to; (4) whether the

28  consent language contained a hyperlink (in the case of consenting web opt-in forms); and (5) the

1    content of any hyperlinked page (also in the case of consenting web opt-in forms).  Further, in

2    many instances the evidence of consent—particularly for the pre-LeadiD leads—will reside with

3    the individual lead generators or, in some instances, with the consumers themselves.  Duband

4    Decl. ¶¶ 9-12.; Polka Decl. ¶ 8.  This is the opposite of a uniform consent showing—and this is

5    only *one* lead channel.

6            Each of the other lead channels also requires its own individualized consent inquiry.  For

7    the Direct Mail Channel, SolarCity secured consent from consumers who called SolarCity in

8    response to direct mail advertisements through a recorded phone call.  Sebenius Decl. ¶ 23.  A

9    consent finding here depends on an examination of each call recording and the specific consent

10   language agreed to by each consumer (for all future calls).  For the SolarCity.com channel,

11   consumers submitted their information online to receive a quote, reading a disclaimer and

12   agreeing to it before receiving a call.  Since the disclaimer varied over time, consent for this

13   channel depends on the time period each customer lead was called and the specific disclaimer

14   language at the time of call.  And consumers who came through the Partner Store Channel would

15   have provided their contact information on a Lead Capture Form stored on an in-store

16   representative's tablet, although that language also changed over time, making the consent

17   inquiry dependent on the specific date of a customer lead and the Lead Capture Form language on

18   that date.

19           Add to this inquiry yet another highly fact-intensive one.  To the extent Plaintiff

20   additionally alleges a NDNC class, the consent inquiry will not *only* depend upon all of the

21   above, but will *also* depend on examination of each and every customer lead record to determine:

22   (1) whether a consumer was on the NDNC list; (2) what lead channel the consumer came

23   through; (3) when the consumer's customer lead record was created; and (4) when SolarCity

24   made each call to that consumer's number.  This is the only way—record by record—that the

25   Court can determine consent under the NDNC's inquiry exemption, i.e., whether any calls were

26   made to consumers on the NDNC list outside the allowable three month inquiry-exemption

27   period.

28           These multiple and varied methods of consent make proof of such consent through a

- 14 -

1    single or common means impossible, regardless of whether a consumer was/is on the NDNC

2    registry or whether the call was allegedly placed with an autodialer.

3            Courts confronted with similar consent complexities agree.  In *Connelly v. Hilton Grand*

4    *Vacations Co.,* 294 F.R.D. 574, 578 (S.D. Cal. 2013), the court denied certification after finding

5    that the putative class members consented to be contacted in a variety of ways—including by (1)

6    signing up for a loyalty rewards program over the phone, online, or through a paper application,

7    and (2) reserving rooms online, over the phone, or through brick-and-mortar travel agencies.  294

8    F.R.D. at 577-78 ("the predominance requirement [was] not satisfied," because the defendant's

9    "call list [was] not a list of homogenously unconsenting recipients.") (quoting *Vigus v. So. Ill.*

10   *Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 237 (S.D. Ill. 2011)).

11           Judge Gilliam reached a similar conclusion in *True Health Chiropractic, Inc. v. McKesson*

12   *Corp.*, No. 13-cv-02219-HSG, 2016 U.S. Dist. LEXIS 111657 (N.D. Cal. Aug. 22, 2016).  There,

13   the defendant showed it obtained consent to send faxes to consumers in a number of ways—

14   including through:  (1) oral and email communications with sales representatives; (2) consumers

15   providing fax numbers during registration; (3) checking a box during software registration; and

16   (4) completing written consent forms that provided express permission to be contacted by faxes.

17   *Id*. at *9-10.  Although some common issues existed (such as whether a certain form used by the

18   defendant constituted "express permission"), the court held that "the diversity of ways in which

19   Defendants allegedly received permission suggests that the issue of consent should be evaluated

20   individually, rather than on a classwide basis."  *Id.* (citing *Connelly*, 294 F.R.D. at 578).  The

21   court emphasized that *True Health* was unlike those TCPA cases "in which consent was received

22   through uniform means, thus facilitating generalized determinations under the law."  *Id.* at *10. [12]

23

24   _____

[12]   *See Blair v. CBE Group, Inc.*, 309 F.R.D. 621 (S.D. Cal. 2015) (no certification because

25   "Defendant has, in fact, provided evidence regarding consent by all three Plaintiffs that
     demonstrates the need for individualized inquiries on the issue of consent"); *Gannon v. Network

26   Tel. Servs., Inc.*, No. CV 12-9777-RGK PJWX, 2013 U.S. Dist. LEXIS 81250, 2013 WL
     2450199, at *2 (C.D. Cal. June 5, 2013) (no predominance of common questions where evidence

27   of varied ways in which class members consented), *aff'd*, 628 F. App'x 551 (9th Cir. 2016);
     *Simon v. Healthways, Inc.*, No. CV 14-08022-BRO, 2015 WL 10015953 (C.D. Cal. Dec. 17,

28   2015) (issue of prior express consent is individualized); *Gene and Gene LLC v. Biopay LLC*, 541
     F.3d 318, 329 (5th Cir. 2008) (because defendant "culled fax numbers from a variety of sources,"

1    So here.  Proof of consent is not uniform, either across SolarCity's lead channels or within

2    them, and the Court should deny certification.  Moreover, Plaintiff's cited cases only underscore,

3    rather than refute, the point that predominance in TCPA actions can only be satisfied if there is *no*

4    evidence of consent or if the defendant obtained consent using a single, uniform method for

5    obtaining consent.[13]  *See, e.g.*, *Booth v. Appstack, Inc*, No. C13-1533JLR, 2015 WL 1466247, at

6    *11 (W.D. Wash. Mar. 30, 2015) ("Where there is evidence that some class members gave prior

7    express consent but others did not … the individualized inquiries necessary to ascertain consent

8    will preclude a finding that common questions predominate."); *Fields v. Mobile Messengers Am.,*

9    *Inc.*, No. C 12-05160 WHA, 2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) (finding that unlike

10   other cases where the defendant did not show consent, the *Fields* defendant recorded over 1.5

11   million instances of consent on its platform).[14]  Again, neither is true here.

12

13   "individual inquiries of the recipients are necessary to sort out which transmission was consented
     to").

14   [13] *See G.M. Sign, Inc. v. Franklin Bank, S.S.B*., No. 1:06-cv-00949, 2008 WL 3889950 (N.D. Ill.
     Aug. 20, 2008) (general testimony of consent inadequate);  *Stern v. DoCircle, Inc.*, No. SACV
15   12-2005 AG, 2014 WL 486262, at *3 (C.D. Cal. Jan. 29, 2014) (no "evidence as to the consent");
     *Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *10
16   (S.D. Cal. Sept. 5, 2013) (no showing that "consent may vary by individual"); *Whitaker v. Bennett
     Law, PLLC*, No. 13-cv-3145-L(NLS), 2014 WL 5454398, at *6 (S.D. Cal. Oct. 27, 2014)
17   (defendant defaulted); *Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434, 446 (E.D. Mich. 2015) (only
     notional argument of consent); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D.
18   674, 688 (S.D. Fla. 2013) (class members "went through the same or similar admissions
     process"); *CE Design v. Beaty Constr., Inc.*, No. 07 C 3340, 2009 WL 192481, at *5, *9 (N.D. Ill.
19   Jan. 26, 2009) (actions were "uniform and routine"); *Hinman v. M & M Rental Ctr., Inc.*, 545 F.
     Supp. 2d 802, 806-07 (N.D. Ill. 2008) ("standardized course of conduct"); *Ira Holtzman, C.P.A. v.
20   Turza,* 728 F.3d 682, 684 (7th Cir. 2013) (consent irrelevant); *Chapman v. Wagener Equities,
     Inc.*, No. 09 C 07299, 2014 WL 540250, at *5, *15 (N.D. Ill. Feb. 11, 2014) (no consent);
21   *Balbarin v. N. Star*, No. 10 C 1846, 2011 WL 211013, at *1 (N.D. Ill. Jan. 21, 2011) (no
     individualized issues).
22
     [14] This Court's opinion in *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013), is a
23   case in point.  In *Lee*, a single computer sent an identical unsolicited text message to a group of
     59,568 consumers over a 5-day period.  (Motion to Certify Class, *Lee v. Stonebridge Life Ins. Co.*,
24   No. 3:11-cv-00043, (N.D. Cal. Aug. 29, 2012).)  While the *Lee* defendant argued that individual
     issues of consent defeated predominance, it put forth *no* evidence demonstrating that any of these
25   consumers had ever consented to receiving a text message. 289 F.R.D. at 295.  Rather, the *Lee*
     defendant relied exclusively on the fact that the plaintiff did not "eliminate[] the possibility that
26   the dialing lists used here were generated, at least in part, from websites where individuals had
     consented to receiving such messages." *Id.*  The Court deemed the theoretical possibility of
27   consent insufficient, but did not rule out the possibility of decertification if merits discovery
     revealed actual, instead of hypothetical, evidence of consent. *Id.*

28

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

In short, to the extent Plaintiff or any purported class member disputes this evidence, individualized inquiries and mini-trials will be required to resolve such disputes.  Class certification should be denied on this basis alone.  *See Newhart*, 2016 WL 7118998, at *5 (denying class certification for lack of predominance in light of each call-intensive and fact-intensive nature of consent inquiry).

### 2.    Plaintiff's Proposed Subclasses Cannot Overcome Issues of Individualized Consent

Faced with SolarCity's individualized consent records, Plaintiff Lucero proposes two subclasses, neither of which can survive certification as they face the same consent challenges as the Autodialer and NDNC classes do.

First, he proposes Autodialer and NDNC subclasses that exclude consumers for whom SolarCity has a LeadiD record.  (Mem. at 16.)  Plaintiff Lucero presumes that if SolarCity does not have a LeadiD for a particular consumer, then that person did not provide the requisite TCPA consent to be called, and no further factual inquiry is necessary.  That presumption is wrong. SolarCity's LeadiD records relate only to (a) customer leads from lead generators (b) after November 2015.  There are many, many consumers without LeadiD records who provided consent—such as those who came through the SolarCity.com Channel, the Partner Store Channel, and leads from lead generators sold to SolarCity before November 2015.  *See supra*; s*ee* Duband Decl. Exs. C–I (evidence of consent prior to November 2015); Polka Decl. Ex. B (same).  Again, each group of consumers and lead channels raises individualized consent issues.

Second, Plaintiff Lucero proposes Autodialer and NDNC subclasses of individuals for whom SolarCity has no LeadiD record specifically naming SolarCity, contending that consent for a "solar provider" or "home services company" to call is not enough.  (Mem at 5.)  Plaintiff mistakenly reads a requirement into the TCPA that does not exist.  The FCC "allows the seller the flexibility to determine the type of written agreement that it will secure from the consumer," and the FCC "does not require a particular form or format for this written agreement or its retention." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1842, 1872 (2012).  Accordingly, courts have found that prior express consent may be

1    obtained through intermediaries.[15]

2            Lucero further asserts, incorrectly, that the Ninth Circuit found in *Satterfield* that "consent

3    to receive calls from one business does not constitute consent to receive calls from a different

4    business." (Mem. at 16). Not so.  Rather, the Ninth Circuit found that consent to receive

5    promotional material from a company's "affiliates and brands" did not extend to the defendant

6    because it was neither an "affiliate" nor a "brand of the defendant" based on the plain language of

7    the consent.  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).  What

8    *Satterfield* ultimately instructs is that the scope of the consent "depends on the facts specific to

9    the case," *Selby*, 2016 WL 6677928, at *8, which is consistent with the FCC's approach.  *See*

10   *Matter of GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory*

11   *Ruling Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 29

12   F.C.C. Rcd. 3442, 3444 (Mar. 27, 2014) (the scope of consent under the TCPA "must be

13   determined upon the facts of each situation").

14           Plaintiff also conveniently ignores the facts.  The consent secured by SolarCity's lead

15   generators typically *did* incorporate a hyperlink (*e.g.*, "service providers") directing consumers to

16   a page naming SolarCity, among others.  Duband Decl. ¶ 10.  Unlike in *Satterfield*, where the

17   consent form did not define "Affiliate" and "Brand," 569 F.3d at 955, the hyperlinks here often

18   name specific companies, including SolarCity.  *See In re Yahoo Mail Ltig.*, 7 F. Supp. 3d 1016,

19   1028-29 (N.D. Cal. 2014) (users registering for Yahoo Mail account consented to terms of Yahoo

20   Additional Terms of Service and Privacy Policy contained in hyperlinks).  In fact, the language

21   within Plaintiff Lucero's own LeadiD record proves the point, as the consent form associated with

22   his number included the hyperlink "home service companies" which led to a page identifying

23   SolarCity as one of those home service companies.  Sarchio Decl. Ex. D.

24           So long as Plaintiff disputes consent—as he must to keep his case alive—the factfinder

25

26   _____
     [15] *See Baird v. Sabre Inc.*, 995 F. Supp. 2d 1100, 1101, 1106–07 (C.D. Cal. 2014) (plaintiff's
     consent to be contacted by an airline extended to messages sent by third-party); *Selby v. LVNV*

27   *Funding, LLC*, No. 13-cv-01382, 2016 WL 6677928, at *9 (S.D. Cal. June 22, 2016); *Barrett v.*
     *ADT Corp.*, No. 15-cv-1348, 2016 WL 865672 (S.D. Ohio Mar. 7, 2016) (consent through one of

28   ADT's marketing partners or one of its 300 independent dealers defeated predominance).

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

1    will have to examine the specific form of consent for each putative class member, including

2    determining (1) which of the hundreds of varieties of consent language was used and in what

3    particular lead channel; (2) whether the consent language named SolarCity specifically or made

4    general references to solar or home services companies, or contained a hyperlink; (3) if there was

5    a hyperlink, whether SolarCity was named on the linked page; and (4) whether SolarCity fell

6    within the scope of the consent.  Given that "the only way to locate a call recipient's possible

7    consent is to conduct a 'mini-trial' for each individual," "class members' common questions do

8    not predominate over individual questions."  *Barrett*, No. 2016 WL 865672, at *9; *see also*

9    *Newhart*, 2016 WL 7118998, at *5 ("the Court would need to examine different forms of written

10   consent for different [consumers] to determine whether they comply with the FCC's regulations

11   shows that the class inquiry would fracture into mini-trials incompatible with class treatment").

### 3.     Individualized Issues Predominate Regarding ATDS Issues

13            Plaintiff argues that the question of "whether SolarCity placed the calls in question using

14   an automated telephone dialing system" is a "common and controlling" question that can be

15   resolved "in one stroke."  Mem. at 10:2-6.  This is incorrect.  At least three separate "strokes"

16   would be required:  The jury will need to look at SolarCity's telephone systems and determine

17   whether (1) SolarCity's two Asterisk systems, (2) its various Mitel MCD systems, and (3) its

18   Genesys system were capable of dialing without human intervention at the different times the

19   calls at issue were placed.  This will determine whether any system is an autodialer.  *See In the*

20   *Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd.

21   7961, 7975, 7991–92, ¶17 (2015) ("How the human intervention element applies to a particular

22   piece of equipment is specific to each individual piece of equipment, based on how the equipment

23   functions and depends on human intervention, and is therefore a case-by-case determination.").

24            But this determination requires an individualized inquiry into the characteristics of each

25   phone system used in a given period of time and into each specific version of the particular

26   system used at that time.  Indeed, while SolarCity's expert opines that none of these systems were

27   capable of autodialing (*see* Horak Declaration), and Plaintiff's expert takes the opposite view (*see*

28   Snyder Declaration), both experts agree on one fundamental principle:  Assessing whether each

1    telephone system is an ATDS requires an *individualized* evaluation of each specific,

2    technologically distinct telephone system.  *Compare* Horak Decl., ¶ 60 (varying software

3    configurations, applications, topography, and architecture of each dialing system make

4    individualized determination necessary to render a reliable opinion) *with* Sarchio Decl. Ex. H,

5    Snyder Dep. 239:10-24.

6           There are myriad differences between SolarCity's Asterisk-based systems, its Mitel MCD

7    systems, and the Genesys system that it currently uses that would necessitate separate mini-trials

8    to determine whether the systems constitute ATDS under the TCPA, and which class members

9    received calls under which system.[16]  Moreover, autodialer claims require proof of calls without

10   express consent, which further splinters the factual issues that would have to be decided.[17] *Meyer*

11   *v. Portfolio Recovery Assocs. LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

12          **B.     Plaintiff Cannot Demonstrate an Identifiable and Manageable Class**

13              **1.     Plaintiff Proffers Overbroad Definitions**

14          Plaintiff's motion defines the classes differently than does his complaint, and, as he

15   neither sought nor secured leave to file an amended pleading containing different class

16   definitions, the Court should deny the motion on this basis alone.  *See Richie v. Blue Shield of*

17   *California*, 2014 WL 6982943, at *13-15 (N.D. Cal. Dec. 9, 2014); *Costelo v. Chertoff*, 258

18   F.R.D. 600, 604-605 (C.D. Cal. 2009) ("The Court is bound to class definitions provided in the

---

19   [16] As but one example, SolarCity's Genesys system allowed sales representatives to "click-to-
20   dial," whereas Mitel and Asterisk required sales representatives to dial using their fingers on
     physical telephones.  *See* Sarchio Decl. Ex. P, Raymond Dep. 218:8-219:4.  The issue of whether
21   "click-to-dial" functionality renders the dialing system an ATDS creates an individualized issue
     applicable only to those class members who received calls from the Genesys system.  Numerous
22   courts have concluded that "click to dial" systems are not ATDS because they rely on human
     intervention to initiate the calling process.  *Gaza v. LTD Fin. Servs., L.P.,* No. 8:14-CV-1012-T-
23   30JSS, 2015 WL 5009741 (M.D. Fla. Aug. 24, 2015); *Modica v. Green Tree Servicing, LLC.,* No.
     14 C 3308, 2015 WL 1943222 (N.D. Ill. Apr. 29, 2015); *Strauss v. CBE Grp., Inc.,* 173 F. Supp.
24   3d 1302 (S.D. Fla. 2016); *Pozo v. Stellar Recovery Collection Agency Inc.*, No. 8:15-cv-00929-
     AEP, 2016 U.S. Dist. LEXIS 146432 (M.D. Fla. Sept. 2, 2016).

25   [17] Plaintiff asserts in a footnote (Mtn. 16 n. 6), that "express consent" is not an element of a
     TCPA plaintiff's prima facie case. None of the cases upon which Plaintiff relies for this point
26   involved class certification, but rather stood for the general notion that express consent is an
     affirmative defense at the early pleading stage.  Rather, "at the class certification stage, the
27   plaintiff must prove that consent, or the lack thereof, can be resolved on evidence and theories
     applicable to the entire class." *Booth v. Applestack*, No. C13-1533JLR, 2015 WL 1466247, at *9
28   n. 6 (W.D. Wash. Mar. 30, 2015).

1    complaint and, absent an amended complaint, will not consider certification beyond it.").

2           Notwithstanding these procedural deficiencies, the class and subclass definitions are

3    "defined so broadly as to include a great number of members who for some reason could not have

4    been harmed by the defendant's allegedly unlawful conduct." *Torres v. Mercer Canyons Inc*.,

5    835 F.3d 1125, 1138 (9th Cir. 2016) (internal citations omitted).  Courts have repeatedly denied

6    certification in TCPA cases when the evidence demonstrates that at least some purported class

7    members consented to receive the communications at issue.  *See Gannon v. Network Tel. Servs.,*

8    *Inc.,* 2013 WL 2450199, at *2 (C.D. Cal. June 5, 2013) (class not ascertainable because varied

9    consent profiles require mini-trials on the merits), *aff'd* 628 F. App'x 551 (9th Cir. 2016).

10          That is the situation here.  Plaintiff's proposed Autodialer class makes SolarCity liable for

11   *all* outbound calls SolarCity placed, regardless of the purpose of the call or whether SolarCity

12   secured consent from the recipient. (Mem. at 18.)  Similarly, Plaintiff's proposed NDNC class of

13   "All individuals registered on the [NDNC] Registry whom SolarCity Corp. called more than one

14   time in a 12-month period on their cellular or landline," does not even attempt to distinguish

15   between telephone solicitations and calls placed within three months of an inquiry or based on an

16   established business relationship, which are not subject to the NDNC.  Thus, it improperly

17   captures calls for which the recipient did not suffer TCPA harm.

18          Apparently recognizing his definitions are over broad, Plaintiff proposes narrower

19   subclasses to cover class members for whom SolarCity "has no LeadID record."  This does not

20   solve Plaintiff's overbreadth problem.  LeadiD records do not exist for leads that came in through

21   channels other than the Lead Generator Channel or prior to November 2015. Sebenius Decl. ¶¶

22   11, 16.  Redefining the class to include persons who received calls other than telemarketing calls,

23   including current customers, or who consented despite not having a LeadiD record, among other

24   variables, "renders it overbroad and the class unfit for certification." *Vigus v. S. Ill.*

25   *Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 235 (S.D. Ill. 2011).

26          **2.     Plaintiff Cannot Demonstrate Superiority and Manageability**

27          Because Plaintiff's theoretical plan to ascertain membership unacceptably requires the

28   Court to conduct individualized inquiries, Plaintiff cannot establish the requisite manageability

- 21 -

1    and efficiency of proceeding as a class action.  *Warnick v. Dish Network LLC*, 301 F.R.D. 551 (D.

2    Colo. 2014) (TCPA class not ascertainable as it requires factual inquiry into individuals' varied

3    consent profiles).  Plaintiff's proposed plan is premised on the assertion that simply comparing

4    the calls SolarCity made based on its call logs to both the NDNC list and SolarCity's LeadiD

5    records (Mem. at 18-20) is sufficient to determine membership in the class.  Plaintiff provides no

6    actual evidence on the feasibility of such a task.  Nor can he, as SolarCity has provided evidence

7    that individuals listed on the NDNC might have nevertheless provided consent outside of LeadiD

8    or may have been called within three months of submitting their inquiry.  *See* Section I-B, supra.

9           Plaintiff's expert Verkhovskaya acknowledges she did not actually match the names to the

10   numbers in the DNC database, or run the names through data processors or subpoena wireless

11   carriers to provide a sampling of how the Court could determine membership.[18]  Nor does Ms.

12   Verkhovskaya address limitations with her plan to include the fact that numbers, and the

13   subscribers assigned to those numbers, certainly change over time.  *See Southwell v. Mort. Inv'rs*

14   *Corp. of Ohio, Inc.*, No. C13-1289, 2014 WL 3956699, at *4 (W.D. Wash. Aug. 12, 2014)

15   (holding that expert declaration of Verkhovskaya was insufficient to meet Rule 23 standard

16   because "Ms. Verkhovskaya's declaration is entirely prospective; i.e., it simply describes what

17   she intended to do with the data provided by Plaintiffs").  Thus, Plaintiff's speculative notion of

18   how best to ascertain membership does not satisfy Rule 23(b)(3)'s manageability requirements.[19]

19          **C.     Plaintiff Lucero Is Neither Typical of Nor Adequate to Serve the Class**

20          Rule 23(a) requires a finding that the "named plaintiff's claim and the class claims are so

21   interrelated that the interests of the class members will be fairly and adequately protected in their

22

23   [18] The failure of Ms. Verkhovskaya to match any of the numbers to the DNC database also means
     "that her declaration cannot constitute proof of the numerosity element required to establish that
24   Plaintiffs are entitled to prosecute a class action lawsuit."  Therefore, Plaintiff has failed to
     establish numerosity for the DNC Class by showing that any of the calls at issue, apart from
25   Plaintiff Lucero, were actually placed to individuals on the DNC.  *See Southwell,* 2014 2014 WL
     3956699, at *4.

26   [19] SolarCity reserves its right to supplement its arguments relating to Ms. Verkhoskaya's report
     when it receives a full production of facts and data considered by Ms. Verkhovskaya in forming
27   the opinions in her December 8, 2016 report.  To date, Plaintiff has ignored SolarCity's repeated
     demands for a full production and disclosure of all facts and data considered by Ms.
28   Verkhovskaya.  *See* Sarchio Decl. Exs. N, R.

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

1    absence" before certifying a class. *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157 n.13 (1982).

2    A named plaintiff cannot satisfy typicality and adequacy of representation unless he is a member

3    of the class "which he or she seeks to represent." *Sosna v. Iowa,* 419 U.S. 393, 403 (1975);

4    *Sueoka v. United States*, 101 F. App'x 649, 653–54 (9th Cir. 2004) (citations omitted).

5    Moreover, a named plaintiff cannot represent a class if his "unique background and factual

6    situation require[s] him to prepare to meet defenses that were not typical of the defenses which

7    may be raised against other members of the proposed class." *Ellis*, 657 F.3d at 984.  At worst, the

8    unanswered calls to Lucero were made in error, which makes him neither typical nor adequate as

9    a representative.

10                      **1.      Lucero's "Wrong Party" Claim Renders Him Atypical**

11          Unlike the vast majority of class members, Lucero had no interaction with SolarCity or

12   third-party marketers of solar products.  Sarchio Decl. Ex. I, Lucero Dep. 45:18-25.  Instead, a

13   SolarCity sales agent called Lucero upon receiving a LeadiD record indicating that Phillip

14   Benavidez consented to accept automated calls on the number that turned out to be associated

15   with Lucero's cellphone.  Lucero testified that he does not know Benavidez or how his number

16   made it into SolarCity's records under Benavidez's name.  *Id.* at 80:22-23; 174:8-175:8.  (At the

17   same time, Lucero has refused to provide discovery necessary to test that assertion.  Sarchio Decl.

18   Ex. A.)  As a result, Lucero's claim is based on a "wrong party" or "wrong number" theory.

19          A wrong party TCPA claim is fundamentally different from TCPA claims of individuals

20   who *were* the intended recipients of the phone calls.  *See Buonomo v. Optimum Outcomes, Inc*.,

21   301 F.R.D. 292, 297 (N.D. Ill. 2014).  In *Buonomo*, the court held that the plaintiff failed to

22   satisfy Rule 23(a)(3)'s typicality requirement because his "wrong party" claim lacked the same

23   "essential characteristics" as the claims of actual debtors included in the proposed class.  *Id.*  The

24   court noted "[t]he central inquiry in a 'wrong party' case is *who* provided consent, whereas the

25   central inquiry in an actual debtor [i.e., an intended recipient] case is *whether* the plaintiff

26   provided consent to receive calls on his or her cell phone."  *Id*. (emphasis added)*.*

27          Similarly here, Lucero's factual situation presents defenses unique to him, including

28   whether Lucero himself submitted the information falsely using Benavidez's name, and SolarCity

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-CV-05107

1    believed in good faith it could call the number.  These unique defenses doom his certification

2    request.  *See Banarji v. Wilshire Consumer Capital, LLC*, No. 14-cv-2967, 2016 WL 595323, at

3    *3 (S.D. Cal. Feb. 12, 2016) (unique defenses precluded certification where non-subscriber

4    provided consent); *Chyba v. First Fin. Asset Mgmt., Inc.*, No. 12-cv-1721, 2014 WL 1744136

5    (S.D. Cal. Apr. 30, 2014) (defendant acted in good faith that plaintiff consented).

6                    **2.     A LeadiD Record Existed for Lucero's Number, Thereby Excluding
                               Him From the Very Classes He Seeks to Represent**

7

8             There is more.  Plaintiff Lucero also fails to meet the definition of Subclasses A or

9    Subclasses B, offered up for the first time in the certification motion, and thus cannot represent

10   those subclasses.  *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014);

11   *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-CV-04457, 2016 WL 879784, at *8-9 (N.D.

12   Cal. Mar. 8, 2016) (no certification when plaintiff "does not fall within the class definition");

13   *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV 14 6256, 2016 WL 3456939, at *12 (C.D. Cal.

14   Apr. 14, 2016) (plaintiff "no longer falls within the TCPA Class definition").

15            Lucero defines Autodialer Subclass A and NDNC Subclass A (collectively "Subclass A")

16   as individuals "for whom SolarCity Corp has no LeadiD record."  (Mem. 5).  To identify Subclass

17   A members, Lucero would exclude any number in SolarCity's call records which correspond to a

18   number in a LeadiD record.  (Mem. 18-19).  But, as Lucero's number *is listed* in SolarCity's

19   LeadiD records, he falls outside of Subclass A and can't represent them.  Sarchio Decl. Ex. D.

20            Similarly, Plaintiff Lucero does not fall within his definition for Autodialer Subclass B

21   and NDNC Subclass B (collectively "Subclass B").  Lucero defines these subclasses as

22   individuals "for whom SolarCity Corp. has no LeadiD record specifically naming SolarCity

23   Corp."  The LeadiD record associated with Lucero's number, however, indicates that Benavidez

24   consented to receiving information from "home service companies," and includes a hyperlink to a

25   page naming SolarCity.  *Id.*  Consequently, Lucero also falls outside of Subclass B.

26                    **3.     Lucero Cannot Represent Customers and Non-Costumers**

27            All of Lucero's proposed class definitions include calls placed to hundreds of thousands of

28   SolarCity customers, who have signed contracts containing a binding arbitration clause with a

DEFENDANT SOLARCITY'S OPPOSITION TO
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:15-cv-05107

1  class action waiver.  Sarchio Decl. Ex. O.  Also, each customer lead that came through

2  SolarCity's website agreed to SolarCity's Terms of Use, which included a binding arbitration

3  clause and class action waiver.  Sarchio Decl. Exs. S, T.  The presence of the arbitration clauses

4  creates a "plain distinction" between Lucero and SolarCity's customers and website users, and

5  further confirms that certification is simply not proper here.  *See Labou v. Cellco Partnership*,

6  No. 2:13-cv-00844, 2014 WL 824225, at *4 (E.D. Cal. Mar. 3, 2014) (rejecting certification

7  where the class included both existing customers and non-customers).

8            **D.**      <u>**The TCPA's Award of Monetary Damages Bars A Rule 23(b)(2) Class**</u>

9            In an effort to overcome the many barriers to his (b)(3) classes, Plaintiff resorts to seeking

10  to certify a (b)(2) injunction-only class. The Supreme Court rejected such a tactic in *Wal–Mart*

11  *Stores, Inc. v. Dukes*, holding that Rule 23(b)(2) "does not authorize class certification when each

12  class member would be entitled to an individualized award of monetary damages." 564 U.S. at

13  360-61; *Blackwell v. Skywest Airlines, Inc.*, 245 F.R.D. 453, 466 (S.D. Cal. 2007) (plaintiff must

14  show that monetary damages merely incidental to injunctive relief). Here, each class member can

15  independently claim statutory damages under the TCPA, and Lucero expressly seeks statutory

16  damages of $500 for each of the purported "millions" of alleged violations. 47 U.S.C. §

17  227(b)(3)(B). "Thus Plaintiff['s] TCPA claims are ineligible for Rule 23(b)(2) certification,

18  regardless of Plaintiff['s] parallel request for injunctive relief." *Connelly*, 294 F.R.D. at 579; *see*

19  *also Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303 (S.D. Cal. 2015).

20  **V.**      **CONCLUSION**

21            For the foregoing reasons, the Court should deny the motion for class certification.

22

23

24    Dated:  January 26, 2017                 RANDALL S. LUSKEY
                                          Orrick, Herrington & Sutcliffe LLP

25

26                             By:          */s/ Randall S. Luskey*

27                                   RANDALL S. LUSKEY
                             Attorneys for Defendant SolarCity Corp.

28