1   RANDALL S. LUSKEY (CA SBN 240915)
    rluskey@orrick.com
2   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
3   405 Howard Street
    San Francisco, California 94105
4   Telephone: 415-773-5700
    Facsimile: 415-773-5759
5
    ELYSE D. ECHTMAN (Admitted *Pro Hac Vice*)
6   eechtman@orrick.com
    ORRICK, HERRINGTON & SUTCLIFFE LLP
7   51 West 52nd Street
    New York, New York 10019-6142
8   Telephone: 212-506-5000
    Facsimile: 212-506-5151
9
    TIFFANY CHEUNG (CA SBN 211497)
10  TCheung@mofo.com
    MORRISON & FOERSTER LLP
11  425 Market Street
    San Francisco, California  94105-2482
12  Telephone: 415-268-7000
    Facsimile: 415-268-7522
13
    Attorneys for Defendant
14  SOLARCITY CORP.

15
                    UNITED STATES DISTRICT COURT
16
                  NORTHERN DISTRICT OF CALIFORNIA
17
                      SAN FRANCISCO DIVISION
18

19  JOSE ALBINO LUCERO JR., on Behalf of          Case No.    3:15-cv-05107-RS
    Himself and all Others Similarly Situated,
20                                                **SOLARCITY'S MEMORANDUM
                        Plaintiff,                OF POINTS AND AUTHORITIES
21                                                IN SUPPORT OF FINAL
            v.                                    APPROVAL OF CLASS
22                                                SETTLEMENT AND IN
    SOLARCITY CORP.,                              RESPONSE TO OBJECTIONS**
23
                        Defendant.                Hon. Richard Seeborg
24                                                Action Filed: November 6, 2015

25                                                Date: January 18, 2018
                                                  Time: 1:30 PM
26                                                Courtroom 3, 17th Floor

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

I.     PRELIMINARY STATEMENT .................................................................................... 1

II.    BACKGROUND .......................................................................................................... 2

    A.    SolarCity's "No Cold Call" Commitment and Consent Practices ...................... 2

    B.    SolarCity Does Not Use and Never Has Used an Autodialer .............................. 3

    C.    This Lawsuit and Plaintiff's Claims .................................................................... 3

    D.    The Settlement Negotiations ................................................................................ 4

    E.    The Settlement Class and Key Settlement Terms ................................................ 5

    F.    Preliminary Approval .......................................................................................... 5

    G.    Class Notice ......................................................................................................... 5

III.   RESPONSE OF THE SETTLEMENT CLASS ............................................................ 7

IV.   THE OBJECTIONS SHOULD BE OVERRULED ..................................................... 8

V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE........................ 11

    A.    The Settlement Is Entitled to a Presumption of Fairness .................................. 11

    B. Even Without a Presumption of Fairness, the Settlement Is "Fair, Reasonable, and Adequate" Under the Criteria Applied in the Ninth Circuit......................... 12

        1.    The Strength of Plaintiff's Case .................................................... 12

        2.    Risk, Complexity, Duration, and Expense of Further Litigation .............. 13

        3.    Likelihood of Maintaining Class Certification ......................................... 14

        4.    Settlement Value ....................................................................................... 14

        5.    Extent of Discovery and Stage of the Proceedings .................................. 15

        6.    The Experience and Views of Counsel .................................................... 15

        7.    The Reaction of Class Members ............................................................... 15

        8.    The Settlement Is the Product of Arm's-Length Negotiation ................... 15

VI.   CONCLUSION .......................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Apple Inc. Sec. Litig.*,
No. 5:06-CV-05208-JF (HRL), 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May
17, 2011) ........................................................................................................................16

*In re Bluetooth Headset Products Liability Litigation*,
654 F.3d 935 (9th Cir. 2011)..........................................................................................16

*Boyd v. Bechtel Corp.*,
485 F. Supp. 610 (N.D. Cal. 1979) .................................................................................10

*Brown v. Hain Celestial Grp., Inc.*,
No. 3:11-cv-03082-LB, 2016 U.S. Dist. LEXIS 20118 (N.D. Cal. Feb. 18,
2016) ...............................................................................................................................10

*Churchill Vill. L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004).....................................................................................6, 12

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992)...........................................................................................9

*County of Santa Fe v. Public Serv. Co.*,
311 F.3d 1031 (10th Cir. 2002).........................................................................................9

*Couser v. Comenity Bank*,
125 F. Supp. 3d 1034 (S.D. Cal. 2015) ...........................................................................10

*Edwards v. Nat'l Milk Producers Fed'n*,
No. 11-cv-04766-JSW, 2017 U.S. Dist. LEXIS 145214 (N.D. Cal. June 26,
2017) ...............................................................................................................................10

*Fulford v. Logitech, Inc.*,
No. 08-cv-02041 MMC, 2010 U.S. Dist. LEXIS 29042 (N.D. Cal. Mar. 5,
2010) .......................................................................................................................7, 8, 15

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (1998)........................................................................................................9

*Hughes v. Microsoft Corp.*,
Nos. C 98-1646C, C 93-0178C, 2001 U.S. Dist. LEXIS 5976 (W.D. Wash.
Mar. 26, 2001)..................................................................................................................16

*Lo v. Oxnard European Motors, LLC*,
 No. 11-CV-1009, 2011 U.S. Dist. LEXIS 144490 (S.D. Cal. Dec. 15, 2011),
 2012 U.S. Dist. LEXIS 73983 (May 29, 2012).........................................................................10

*In re Mego Fin. Corp. Sec. Litig.*,
 213 F.3d 454 (9th Cir. 2000)......................................................................................................7

*Mendez v. C-Two Grp., Inc.*,
 No. 13-cv-05914-HSG, 2017 U.S. Dist. LEXIS 103625 (N.D. Cal. July 5,
 2017) ..........................................................................................................................................9

*Milligan v. Toyota Motor Sales, U.S.A., Inc.*,
 No. C 09-05418 (RS), 2012 U.S. Dist. LEXIS 189782 (N.D. Cal. Jan. 6, 2012)....................11

*In re Netflix Privacy Litig.*,
 No. 5:11-cv-00379 EJD, 2013 U.S. Dist. LEXIS 37286 (N.D. Cal. Mar. 18,
 2013) ........................................................................................................................................14

*Officers for Justice v. Civil Serv. Comm'n*,
 688 F.2d 615 (9th Cir. 1982)....................................................................................................11

*Pesce v. First Credit Servs., Inc.*,
 No. 11 C 1379, 2012 U.S. Dist. LEXIS 188745 (N.D. Ill. June 6, 2012).................................14

*Petrovic v. Amoco Oil Co.*,
 200 F.3d 1140 (8th Cir. 1999)....................................................................................................7

*Rodriguez v. West Publ'g Corp.*,
 563 F.3d 948 (9th Cir. 2009)....................................................................................................15

*In re Syncor ERISA Litig.*,
 516 F.3d 1095 (9th Cir. 2008)..................................................................................................11

*Torrisi v. Tucson Elec. Power Co.*,
 8 F.3d 1370 (9th Cir. 1993)........................................................................................................6

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
 396 F.3d 96 (2d Cir. 2005)..........................................................................................................7

*In re Wells Fargo Loan Processor Overtime Pay Litig.*,
 No. C-07-1841 (EMC), 2011 U.S. Dist. LEXIS 84541 (N.D. Cal. Aug. 2,
 2011) ........................................................................................................................................11

**Statutes & Regulations**

28 U.S.C. § 1715(b) ........................................................................................................................6

47 U.S.C. § 227(b)(1)(A) ........................................................................................................12, 14

47 C.F.R. § 64.1200(a)(2) ..............................................................................................................12

**Other Authorities**

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................5

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii) ....................................................................6

Fed. R. Civ. P. 23(e)(2) ..................................................................................11

1 **I.      PRELIMINARY STATEMENT**

2          Defendant SolarCity Corporation ("SolarCity") files this memorandum in support of the

3 proposed settlement of a class action regarding alleged violations of the Telephone Consumer

4 Protection Act ("TCPA"), 47 U.S.C. § 227.  The settlement is clearly "fair, reasonable, and

5 adequate," particularly in light of the strength of SolarCity's defenses, the weakness of Plaintiff's

6 claims, and the severe obstacles Plaintiff faced in certifying a litigation class.  Equally important,

7 the reaction of the settlement class members was overwhelmingly positive.  Ninety-one percent of

8 the settlement class—3.2 million people—received direct, mailed notice.  Yet only four people,

9 representing a mere 0.0001 percent of the class, filed objections, and only 93 settlement class

10 members, or approximately 0.002 percent of the class, have opted out.  Under applicable law,

11 these are powerful indicia that the settlement is fair, reasonable and adequate and warrants final

12 approval.

13          The lawsuit alleged that SolarCity violated the TCPA by making telemarketing phone

14 calls to Plaintiff Jose Albino Lucero Jr. and a proposed class of similarly situated persons,

15 allegedly using an autodialer without having prior consent.  Plaintiff's case was extraordinarily

16 weak.  Fundamentally, SolarCity has never made calls using an Automatic Telephone Dialing

17 System ("ATDS").  As expert testimony established, SolarCity's telephone systems have always

18 required human intervention and did not constitute an ATDS, so the TCPA provision at issue did

19 not apply.  Moreover, consistent with its corporate policy against "cold calls," SolarCity had

20 robust compliance policies in place to ensure that calls were made only to qualified leads—

21 consumers who had affirmatively expressed an interest in SolarCity's products.  Consistent with

22 that policy, SolarCity had prior written consent to call the wireless number purportedly belonging

23 to Plaintiff Lucero.  Plaintiff faced significant hurdles in certifying a litigation class for similar

24 reasons:  SolarCity has strong evidence showing it had prior written consent from call recipients,

25 which plaintiff could have challenged, if at all, only on an individual basis, precluding

26 certification.

27

28

Finally, the objections are meritless.  One is in fact *pro*-SolarCity and *against* the lawsuit.  That objector describes the lawsuit as "truly absurd" and states that SolarCity "is providing solar panels to reduce environmental pollution at affordable prices, and they should be allowed to continue to do so without this harassment."  Two objectors assert, with no discussion or specifics whatsoever, the common complaint that they should be paid more.  Such objections are routinely overruled because they fail to recognize that all settlements are the product of compromise.  They are particularly inappropriate here, where there is a $15 million cash Settlement Fund providing for substantial cash payments for the settlement class members who submit valid claims.

The fourth objector lodges a "small objection" because he contends that the settlement should include injunctive relief.  He is wrong.  Numerous courts have rejected similar objections based on the lack of injunctive relief.  The objection is particularly ill-founded here, where SolarCity has always had operational procedures in place to assure that consent was obtained.  Finally, the objection fails because SolarCity has now implemented additional operational improvements that confirm Plaintiff would not be entitled to any injunctive relief here.

The Settlement is indisputably "fair, reasonable, and adequate."  Plaintiff's claims were weak, the response of the Settlement Class is overwhelmingly favorable, and the objections are meritless.  The Court should overrule the objections and approve the settlement.

## II.     BACKGROUND

### A.     SolarCity's "No Cold Call" Commitment and Consent Practices

SolarCity does not make telemarketing cold calls and never has.  (ECF No. 144-3 ¶ 3.)  Indeed, cold-calling consumers in SolarCity's business makes no economic sense because SolarCity relies on customers who are interested in long-term (typically twenty-year) contracts to purchase the electricity their solar energy systems produce.  (*Id.* ¶¶ 4-5.)  SolarCity thus only calls prospective customers who have expressed an interest in going solar.  (*Id.* ¶ 3.)  Only after a customer affirmatively inquires (a customer "lead"), will SolarCity's sales agents follow up with a call.  (*Id.* ¶¶ 3, 6.)  Leads have been generated through a variety of different channels, including (1) third-party lead generators; (2) the SolarCity website; (3) third-party online/internet search platforms; (4) direct mail advertisements; and (5) partner stores (e.g., The Home Depot and Best

Buy).  (ECF No. 144-4 ¶¶ 2-3.)  Each lead channel is distinct, and each channel obtains consent for telemarketing follow-up calls in different ways.  (*Id.*)

At all times, SolarCity's contracts required that lead generators maintain records of each consumer's consent.  (*Id.* ¶¶ 7-11.)  SolarCity's lead generators generally obtained TCPA consent from prospective customers in two ways.  First, through proof of a consumer's completed website consent form (an "opt-in" form) that contains TCPA-compliant disclosures.  (*Id.* ¶¶ 11-14.)  Second, through a telephone voice recording that confirms the consumer's consent to be called in response to TCPA-compliant disclosures.  (*Id.* ¶ 17.)  Since November 2015, SolarCity also has tracked consent for the Lead Generator Channel through a cloud-based technology platform called LeadiD.  (*Id.* ¶¶ 11-12.)  LeadiD requires lead generators to provide electronic proof of express written consent for each lead submitted.  (*Id.*)

SolarCity owns and operates SolarCity.com and other internet "landing" pages.  (*Id.* ¶ 18.)  Through both SolarCity's proprietary website and its landing pages, consumers can enter their contact information, including telephone number, and request a quote for solar products.  (*Id.* ¶ 19.)  SolarCity's website and landing pages state:  "By clicking here, I agree that SolarCity can contact me via automated technology and/or pre-recorded messages using the number provided. I understand that this consent is not required to make a purchase."  (*Id.*)

**B.    SolarCity Does Not Use and Never Has Used an Autodialer.**

When calling interested customers, SolarCity's sales team has used a variety of telephone systems.  None of these telephone systems had the ability to autodial telephone numbers, without a live sales representative manually placing each call.  (ECF No. 144-10 ¶¶ 2-7.)  SolarCity's wireless telecommunications expert, Ray Horak, performed an individualized evaluation of each of the Asterisk-Xorcom, Asterisk-Securus, Mitel MCD, and Genesys Business Edition Cloud telephone systems that SolarCity's sales teams used during the class period.  (ECF No. 144-11 ¶¶ 67-71.)  He concluded that none of these systems were capable, at the time they placed the calls at issue, of dialing phone numbers without human intervention.  (*Id.*)

**C.    This Lawsuit and Plaintiff's Claims**

The lawsuit alleged that SolarCity violated the TCPA by making telemarketing phone

calls to Plaintiff Jose Albino Lucero Jr. and a proposed class of similarly situated persons, allegedly using an autodialer and without prior consent.[1]

On April 11, 2016, an individual claiming to be named Phil Benavidez went online to Solar.Comparisons.org, a website operated by a lead generator, DoublePositive. (ECF No. 144-4 ¶ 14; No. 144-5 at 32-41.)  He provided SolarCity with consent to be contacted by filling out a form on the website expressing interest in purchasing solar panels, entering his phone number as (505) 205-8750, and authorizing SolarComparisons and up to four home service companies to call him using autodialed calls. (ECF No. 144-5 at 33.)  The phone number entered by "Phil Benavidez" purportedly belonged to Plaintiff Lucero.  While SolarCity made a few calls to that number, no one ever answered or returned these calls, and Lucero admits he had no interaction with SolarCity. (ECF No. 144-2 at 5-8, 322.)  Lucero also admitted that he at times used a "made-up" name to avoid using his real name, and he could not recall how many different times he has used a fake name. (*Id*. at 324-325.)  As a result, SolarCity asked to conduct a forensic examination of his cell phone and laptop, to which Lucero had refused and was the subject of a pending discovery dispute at the time of settlement. (ECF No. 163.)

### D.   The Settlement Negotiations

The settlement negotiations in this case were contentious.  The parties attended an in-person mediation on January 31, 2017, before Hon. Morton Denlow (Ret.) of JAMS, former Magistrate Judge of the Northern District of Illinois, in Chicago, Illinois.  While the parties were unable to reach an agreement at that mediation, they continued to negotiate and executed a Class Action Settlement Term Sheet on May 19, 2017.  After the parties were initially unable to negotiate a formal settlement agreement, Plaintiff moved to enforce the term sheet on June 22, 2017. (ECF No. 168.)  SolarCity filed an opposition to the motion to enforce the term sheet on July 6, 2017. (ECF No. 169.)  The parties were ultimately able to execute a formal settlement agreement on July 12, 2017. (ECF No 171-1.)

---

[1] Two prior Plaintiffs, George Morris and David Hall, have previously dismissed their cases. (ECF Nos. 90, 91.)

### E.    The Settlement Class and Key Settlement Terms

The Settlement Class consists of "all individuals in the United States, from November 6, 2011 to the date the class notice is disseminated, who received from or on behalf of Defendant: (1) one or more calls on their cellphones, or (2) at least two telemarketing calls during any 12-month period where their phone numbers appeared on a National or State Do Not Call Registry or Solar City's Internal Do Not Call List more than 15 days before the calls."  (ECF No. 171-1 ¶ 1.1.35.)

The Settlement Agreement provides for generous cash benefits.  SolarCity agrees to provide a Settlement Fund of $15 million, "for the purpose of making all required payments under this Settlement, including payments for Approved Claims, any approved Fee Award, any approved service awards, and the costs of reasonable class notice and class administration."  (*Id.* ¶ 4.1.)  To receive a check, a settlement class member submits a valid Claim Form by the deadline and then "shall be entitled to a single payment from Defendant in an amount equivalent to his or her *pro rata* share of the Settlement Fund after any approved Fee Award, any approved service awards, and Settlement Administration Costs are deducted."  (*Id.* ¶ 4.3.4.)

### F.    Preliminary Approval

The Court held a hearing on Plaintiff's unopposed motion for preliminary approval of the Settlement on August 31, 2017.  (ECF No. 172.)  In light of the Court's comments at the preliminary approval hearing, the parties executed an addendum to the Settlement Agreement to maximize direct notice to settlement class members.  (ECF No. 174.)  The Court granted preliminary approval on September 15, 2017.  (ECF No. 176.)

### G.    Class Notice

The Class Notice met the requirements of due process and Federal Rule of Civil Procedure 23(b)(3).  Courts must direct to class members "the best notice that is practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B).  Such notice must contain basic information about the class action and class members' rights.[2]  The Ninth Circuit has further required that

---

[2] Specifically, Rule 23 prescribes that class action notices contain: "the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through an attorney if the member so desires; that the court will

notice to absent class members "'generally describe[] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993) (citation omitted); *Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). The Notice used here was the comprehensive class notice plan already approved by the Court and clearly satisfies these requirements.

Notice of the proposed settlement was widely disseminated to potential settlement class members. SolarCity provided addresses where available in their systems, and the Settlement Administrator, Epiq Class Action & Mass Tort Solutions, Inc. ("Epiq"), did a standard update for addresses using the National Change of Address service. (Declaration of Ricky Borges, ECF No. 181-1 ("Epiq Decl.") ¶¶ 7-11.) In addition, to the extent that SolarCity's records did not include address information for identified Settlement Class Members, Epiq performed a reverse phone number lookup to attempt to identify addresses for those Settlement Class Members. (*Id.* ¶ 7.) Direct mail notice was sent to approximately 3,233,594 (91%) of the approximately 3,576,000 settlement class members. (*Id.* ¶ 12.)

The Settlement Administrator created a dedicated website for this Settlement— www.SCTCPASettlement.com—which included a copy of the Full Notice, instructions on how to object or opt out of the settlement, as well as an online claim form that Settlement Class Members could use to submit claims. (*Id.* ¶¶ 19-20.) The Settlement Administrator also established a toll-free telephone number through which Settlement Class Members could request copies of the Full Notice and Claim Form and obtain information about the settlement. (*Id.* ¶ 18.)

The Class Action Fairness Act of 2005 ("CAFA") requires that class action defendants notify appropriate government officials of any proposed settlement. 28 U.S.C. § 1715(b). On July 24, 2017, pursuant to CAFA, Epiq sent a Notice of Class Settlement to the U.S. Attorney General and to the attorneys general of every state. (Epiq Decl. ¶¶ 4-6, Ex. 1.) The Notice

---

exclude from the class any member who requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).

1    provided instructions for accessing a copy of the Complaint and enclosed the Settlement

2    Agreement and all exhibits thereto.  (*Id.* Ex. 1.)  Neither the U.S. Attorney General nor any of the

3    states' attorneys general has objected to or expressed any concerns regarding the Settlement.

4    (Declaration of Tiffany Cheung ("Cheung Decl.") ¶ 2.)

5    **III.    RESPONSE OF THE SETTLEMENT CLASS**

6         The response of the settlement class members was overwhelmingly favorable.  The

7    settlement class encompassed approximately 3,576,000 settlement class members.  (Epiq Decl.

8    ¶¶ 7-8.)  Direct notice was mailed out to approximately 3,233,594 (91%) of those settlement class

9    members, and as of December 29, 2017, detailed notices were requested by and sent to 10,982

10   settlement class members.  (*Id.* ¶¶ 12, 14.)  Yet, only four objections, representing a mere 0.0001

11   percent of the class, were received, and only 93 settlement class members, or approximately

12   0.002 percent of the class, have opted out.  (*Id.* ¶¶ 16-17.)  By contrast, as of December 29, 2017,

13   approximately 114,939 claims have been filed by Settlement Class Members.  (*Id.* ¶ 15.)

14        The infinitesimal number of objectors, coupled with the tiny percentage of opt-outs,

15   strongly supports a finding that the settlement is "adequate."  *In re Mego Fin. Corp. Sec. Litig.*,

16   213 F.3d 454, 459 (9th Cir. 2000) (low number of objections supporting finding that settlement

17   was fair); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 118 (2d Cir. 2005)

18   (18 objections out of 5 million class members is evidence of "overwhelming[] . . . approval");

19   *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999) (approving settlement where

20   objectors represented fewer than 4% of class).

21        The fact that, despite 3,233,594 notices being sent, there are merely four objectors and

22   93 opt-outs also supports a finding that the settlement is "fair and reasonable."  *See In re Mego*,

23   213 F.3d at 459 ("The reaction of the class members to the proposed settlement further supports

24   the conclusion that the district court did not abuse its discretion in finding that the Settlement was

25   fair, adequate and reasonable."); *Fulford v. Logitech, Inc.*, No. 08-cv-02041 MMC, 2010 U.S.

26   Dist. LEXIS 29042, at *12 (N.D. Cal. Mar. 5, 2010) ("In addition, of the approximately 82,091

27   Class Members to receive Notice, only 12 (0.015 %) objected and 10 (0.012 %) opted out.  Such

28   an overwhelmingly positive reaction of the Class Members affected by the Settlement supports its

1  approval.").

2  ## IV.    THE OBJECTIONS SHOULD BE OVERRULED

3       The issues raised in the four objections received are without merit, and the objections

4  should be rejected.

5       **Zoe Sharp**.  The objection filed by Zoe Sharp is actually *pro*-SolarCity and agrees with

6  SolarCity that this lawsuit is meritless.  (Cheung Decl. Ex. A.)  With respect to receiving

7  SolarCity calls, Ms. Sharp wrote "I was barely bothered at all," and this lawsuit results in "overall

8  increasing the price for an important service for all citizens."  (*Id.*)  Her view is that "Solar City is

9  providing solar panels to reduce environmental pollution at affordable prices, and they should be

10 allowed to continue to do so without this harassment," given that this case "strains the bounds of

11 credibility and is truly absurd."[3]  (*Id.*)

12      **Bruce Rorty**.  Mr. Rorty's objection is meritless.[4]  He was allegedly frustrated with his

13 delayed receipt of the class notice at his Post Office Box, but the notice plan was approved by the

14 Court, finding that the notice complies with Federal Rule 23 and due process, "and constitutes the

15 best notice practicable under the circumstances."  (ECF No. 176 at 3.)  He also asserts irrelevant

16 speculation about wanting to sue solar companies *other than* SolarCity, and complained that the

17 settlement compensation amount is inadequate.  (Cheung Decl. Ex. B.)

18      **Robert Pegg**.  Similar to Mr. Rorty, Robert Pegg objects that the settlement amount for

19 class members is not enough.  (*Id.* Ex. C.)  But these objections ignore the nature of settlement

20 and compromise.  There is a strong judicial policy in favor of settlement in the class action

21 context.  *Fulford*, 2010 U.S. Dist. LEXIS 29042, at *5-6 (citing Manual for Compl. Litig., Fourth

22

23      [3] Ms. Sharp notes that she believes the process makes it difficult "to opt out or object
   (multiple letters, in writing, no email contact provided)."  (*Id.*)  But these methods employed to
24 provide objections in writing are standard in all cases.  As addressed in the Court's Order granting
   preliminary approval of the class settlement, the Court-approved notice and claims process was
25 compliant with due process and applicable law.  (ECF No. 176 at 3.)

26      [4] Mr. Rorty also served an untimely opt-out request.  (Epiq Decl. ¶¶ 16-17, Ex. 4.)  If the
   Court were to deem his opt-out to be valid, he lacks standing to object to the class settlement to
27 which he has opted-out, and his opt-out would control over his objection.  (ECF No. 176 at 4.)  In
   any event, Mr. Rorty cannot purport to both opt-out and object to the settlement.
28

1   § 30.42 (2004) ("'[T]he interests of the class as a whole are better served if the litigation is

2   resolved by the settlement rather than pursued.'").  The very nature of a settlement is compromise

3   in the interest of expeditious and cost-effective conclusion of the litigation.  *See Class Plaintiffs v.*

4   *City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992) ("[I]t is the very uncertainty of outcome in

5   litigation and avoidance of wasteful and expensive litigation that induce consensual

6   settlements."); *see also County of Santa Fe v. Public Serv. Co.*, 311 F.3d 1031, 1053 (10th Cir.

7   2002) ("The premise of a settlement and compromise is that each party has an arguable position

8   that it agrees to give up in exchange for an expeditious, inexpensive, and amicable resolution of

9   the matter.").

10   Indeed, each party to a settlement necessarily receives *less* than what he or she may have

11   obtained if he or she ultimately prevailed on the merits.  *Hanlon v. Chrysler Corp.*, 150 F.3d

12   1011, 1027 (1998) ("Of course it is possible . . . that [a] settlement could have been better.  But

13   this possibility does not mean [a] settlement presented [is] not fair, reasonable or adequate.").

14   The nature of a settlement is compromise, and the failure to grant individual settlement class

15   members the specific relief they desire is not grounds for disapproving the settlement.

16   Furthermore, these individuals, and any who share those views, were free to opt out and pursue

17   their individual claims.  These objections should be rejected.  *City of Seattle*, 955 F.2d at 1276

18   (upholding the trial court's grant of final approval over class member objections).

19   **Scott Dodson**.  The objection by Scott Dodson states that he would like "to lodge a small

20   objection to this settlement based on its lack of injunctive relief."  (Cheung Decl. Ex. D.)

21   Professor Dodson's objection that injunctive relief is required to make any TCPA settlement fair

22   and adequate is incorrect.  Rather, it is common for approved TCPA class settlements to include

23   monetary benefits only, even when the complaint prayed for injunctive relief originally.  *See, e.g.*,

24   *Mendez v. C-Two Grp., Inc.*, No. 13-cv-05914-HSG, 2017 U.S. Dist. LEXIS 103625, at *3-4

25   (N.D. Cal. July 5, 2017) (Complaint asked for damages and injunctive relief, but court approved

26   "settlement certificate valued at $10").

27   Numerous courts have rejected objections based on the absence of injunctive relief,

28   finding that injunctive relief was not necessary for fair and adequate class settlements.  *See, e.g.*,

1    *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-cv-04766-JSW, 2017 U.S. Dist. LEXIS 145214,

2    at \*28 (N.D. Cal. June 26, 2017) (approving settlement).  In *Edwards*, for example, the court

3    overruled an objection "that the settlement does not include injunctive relief," reasoning that it

4    was not "this Court's role" to "consider whether the settlement could be improved with different

5    or better relief."  *Id.*; *see also Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 623, 625 (N.D. Cal. 1979)

6    (rejecting objection that there was a "need for injunctive relief" because "the class attorneys felt

7    that the absence of nonmonetary relief should not invalidate" the settlement).   Indeed, courts

8    routinely approve TCPA class settlements that do not include injunctive relief.  *See Couser v.*

9    *Comenity Bank*, 125 F. Supp. 3d 1034, 1047 (S.D. Cal. 2015) (granting motion for final approval

10    of settlement, even though "the Settlement does not provide for injunctive or any other type of

11    non-monetary relief"); *Lo v. Oxnard European Motors, LLC*, No. 11-CV-1009, 2011 U.S. Dist.

12    LEXIS 144490, at \*14-16 (S.D. Cal. Dec. 15, 2011) (approving class settlement, while

13    "Settlement Agreement does not place any restrictions on Defendant's future text messaging

14    practices"), 2012 U.S. Dist. LEXIS 73983, at \*6 (May 29, 2012) (granting final approval).

15          Professor Dodson's objection also ignores the nature of compromise in settlement.

16    Reaching this kind of damages-only settlement makes sense because damages are often times the

17    driving force behind such cases, and obtaining injunctive relief presents additional, significant

18    hurdles.  (*See* ECF No. 144 at 25.)  Although Professor Dodson expresses a preference for

19    injunctive relief over monetary benefits, as detailed in SolarCity's class opposition, plaintiff's

20    prospects of obtaining only injunctive relief are particularly remote.  (*See id*.)  The suggestion of

21    injunctive relief is especially inappropriate here because of SolarCity's robust consent procedures

22    in place before the settlement was reached.  While SolarCity was always TCPA-compliant, it has

23    made further improvements to its practices, which confirm that Plaintiff would not be entitled to

24    injunctive relief here.  *See Brown v. Hain Celestial Grp., Inc.*, No. 3:11-cv-03082-LB, 2016 U.S.

25    Dist. LEXIS 20118, at \*30-31 (N.D. Cal. Feb. 18, 2016) (rejecting objections:  "There is no

26    injunctive relief because — as the course of this litigation shows — cosmetics in both lines

27

28

1    underwent reformulations during the class period and relabeling").[5]  Professor Dodson's

2    objection should be rejected.

3    **V.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

4            A court may approve a settlement that binds class members only after a hearing and a

5    finding that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Federal

6    law favors settlements in class action cases:  "the court's intrusion upon what is otherwise a

7    private consensual agreement negotiated between the parties to a lawsuit must be limited."

8    *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *see also In re*

9    *Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) ("strong judicial policy . . . favors

10   settlements") (citing *City of Seattle*, 955 F.2d at 1276).  As the Ninth Circuit emphasized in

11   *Officers for Justice*, the trial court must scrutinize the settlement only "to the extent necessary to

12   reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or

13   collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair,

14   reasonable and adequate to all concerned."  688 F.2d at 625.

15           **A.      The Settlement Is Entitled to a Presumption of Fairness**

16           Class action settlements are entitled to a presumption of fairness "so long as there has

17   been sufficient discovery, and arms-length negotiations by experienced and capable counsel."

18   *Milligan v. Toyota Motor Sales, U.S.A., Inc.*, No. C 09-05418 (RS), 2012 U.S. Dist. LEXIS

19   189782, at *19 (N.D. Cal. Jan. 6, 2012); *see also In re Wells Fargo Loan Processor Overtime Pay*

20   *Litig.*, No. C-07-1841 (EMC), 2011 U.S. Dist. LEXIS 84541, at *24-25 (N.D. Cal. Aug. 2, 2011).

21   Each of these criteria is satisfied here.  The attorneys for all parties are experienced counsel.  The

22   Settlement was reached only after extensive discovery.  The Settlement was the product of highly

23   
_____

24           [5] SolarCity's prior conduct was TCPA-compliant and Plaintiff faced considerable
     litigation risk, but improvements have been introduced to make the system even better.  Since
25   November 2015, SolarCity has further improved its processes for confirming that it is placing
     calls only to consumers who have provided appropriate consent.  (Declaration of Jonathan
26   Raymond ¶ 3.)  SolarCity has instituted additional operational procedures to further minimize any
     risk of human error, enhanced its auditing of third parties who have identified individuals
27   requesting calls about SolarCity's products, further improved its oversight over the sources from
     which it obtains information about consumers requesting calls, and enhanced training for sales
     representatives regarding TCPA compliance issues.  (*Id.*)

28

1    adversarial, arm's-length negotiations and included formal mediation.  Mediation occurred after

2    extensive discovery, allowing Plaintiff's counsel to fully assess the merits of the claims against

3    SolarCity and its considerable defenses.

**B.      Even Without a Presumption of Fairness, the Settlement Is "Fair, Reasonable, and Adequate" Under the Criteria Applied in the Ninth Circuit**

6        In the Ninth Circuit, the factors that courts consider in assessing the fairness,

7    reasonableness, and adequacy of a settlement are:  (1) the strength of the plaintiffs' case; (2) the

8    risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining

9    class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of

10   discovery completed and the stage of the proceedings; (6) the experience and views of counsel;

11   (7) the presence of a governmental participant[6]; and (8) the reaction of the class to the proposed

12   settlement.  *Churchill Vill.*, 361 F.3d at 575.  In addition, "the settlement may not be the product

13   of collusion among the negotiating parties."  *Id.* at 576 (citing *City of Seattle*, 955 F.2d at 1290).

14   Each of these factors supports approval of the Settlement.

**1.      The Strength of Plaintiff's Case**

16       Plaintiff's case against SolarCity was extremely weak.  To prevail on his TCPA claim

17   against SolarCity, Plaintiff was required to prove by a preponderance of the evidence that he

18   received a marketing call to his wireless phone number from SolarCity that was placed using an

19   ATDS, and the call must have been placed without prior express written consent.  47 U.S.C.

20   § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(2).

21       SolarCity does not now and has never used an autodialer when making marketing calls.

22   SolarCity's wireless telecommunications expert, Ray Horak, performed an individualized

23   evaluation of each of the telephone systems that SolarCity's sales teams used during the class

24   period and concluded that none of these systems were capable, at the time they placed the calls at

25   issue, of dialing phone numbers without human intervention, and none constituted an ATDS.

26

27            [6] Because no party to the settlement is a governmental entity, this factor will not be
     discussed below.

28

1    (ECF No. 144-11 ¶¶ 67-71.)  Plaintiff's proffered expert, Randall Snyder, asserted a contrary

2    "expert" opinion that each of those telephone systems is an ATDS, but SolarCity's motion to

3    exclude his testimony, as he had been excluded in two prior cases (ECF No. 100), was pending at

4    the time settlement was reached.

5           Plaintiff Lucero would also need to overcome considerable consent issues.  As detailed

6    above, SolarCity had prior written consent to call (505) 205-8750 (the number purportedly

7    belonging to Plaintiff Lucero) because an individual named "Phil Benavidez" went online to

8    Solar.Comparisons.org, entered that phone number, and provided consent to be called about solar

9    panels by SolarCity.  (ECF No. 144-4 ¶ 14; ECF No. 144-5 at 32-41.)  Mr. Lucero admits he at

10   times has used fake names, and SolarCity's records show that it had prior express written consent

11   to call Mr. Lucero's alleged phone number.

12          That SolarCity had received consent to call (505) 205-8750 is entirely consistent with

13   SolarCity's company policy of not making cold calls and only calling qualified leads who had

14   requested the calls.  (ECF Nos. 144-3, 144-4.)  SolarCity's compliance practices provided that

15   each lead channel must meet the TCPA's standards.  For these reasons, among others, Plaintiff

16   and the absent class members would have faced enormous difficulty in proving the elements of

17   their TCPA claims against SolarCity.

18          **2.      Risk, Complexity, Duration, and Expense of Further Litigation**

19          If it had not settled, this case would have resulted in additional lengthy and hard-fought

20   litigation.  Before this Settlement was reached, Plaintiff's motion to certify the class, SolarCity's

21   motion to exclude Plaintiff's expert, and a joint discovery dispute letter regarding Plaintiff's

22   refusal to produce relevant devices for inspection were all pending.  After those motions were

23   adjudicated by the Court, the case would have proceeded to dispositive motion practice.  If

24   dispositive motions were unsuccessful, a trial with multiple contested legal and factual issues

25   would have been necessary.  Whatever the outcome of the trial, one or both parties likely would

26   have appealed.

27

28

### 3.  Likelihood of Maintaining Class Certification

Plaintiff's motion to certify the class was pending at the time settlement was reached. Even if a litigation class was certified, merits discovery could reveal evidence warranting decertification, particularly with regard to the issue of class members' consent to be called.  *See In re Netflix Privacy Litig.*, No. 5:11-cv-00379 EJD, 2013 U.S. Dist. LEXIS 37286, at *15-16 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement.").  Even where a telemarketing call is placed to a cell phone using an autodialer (which is not the case here), there is no TCPA violation if the call was made "with the prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A); *see Pesce v. First Credit Servs., Inc.*, No. 11 C 1379, 2012 U.S. Dist. LEXIS 188745 (N.D. Ill. June 6, 2012) (decertifying a TCPA class because the original class included people who had provided consent).

In light of SolarCity's thorough consent practices and no "cold calls" business strategy, SolarCity strongly believes that individual consent evidence would have defeated Class Members' claims.  To the extent any class member disputed such evidence, SolarCity asserts that individualized issues of consent would have made a trial exceedingly difficult to manage. Because the class includes approximately 3,576,000 phone numbers, these individual inquiries would not have been manageable in a single trial.  The Settlement thus provides substantial benefits to the class that likely could not have been obtained on a classwide basis had the litigation continued.

### 4.  Settlement Value

The Settlement offers substantial compensation to settlement class members.  SolarCity will pay $15 million into a Settlement Fund, and each Settlement Class Member who submits a valid claim will receive a payment for "his or her *pro rata* share of the Settlement Fund after any approved Fee Award, any approved service awards, and Settlement Administration Costs are deducted."  (ECF No. 171-1 ¶ 4.3.4.)  The cash benefit to the class is substantial not only in absolute terms, but also when considered against the weaknesses of Plaintiff's case and the evidence that many—if not all—of the potential class members consented to receive calls at their phone numbers and, therefore, would have received nothing in this case.

1   The fact that 114,939 claims have been received by the Settlement Administrator so far is

2   further evidence that class members believe the settlement compensation to be of significant

3   value.

### 5. Extent of Discovery and Stage of the Proceedings

5   This case had fully progressed through fact discovery, which included numerous

6   interrogatories and requests for production.  SolarCity produced over 30,000 pages of documents,

7   as well as call logs referencing millions of calls.  Plaintiff deposed four current or former

8   SolarCity employees and SolarCity's expert, Ray Horak.  SolarCity deposed Plaintiff Lucero,

9   former Plaintiff Morris, and Plaintiff's two experts.  Plaintiff had more than ample information to

10  evaluate the strength of the case, as well as the reasonableness and adequacy of the settlement.

### 6. The Experience and Views of Counsel

12  Experienced counsel for all of the parties recommend approval of the settlement.

### 7. The Reaction of Class Members

14  As addressed above, the reaction of Settlement Class Members has been incredibly

15  positive.  Direct notice was mailed out to approximately 91% of the Settlement Class Members

16  and detailed notices were requested by about 10,982 Settlement Class Members.  (Epiq Decl. ¶¶

17  12, 14.)  Approximately 114,939 claims have been submitted.  (*Id.* ¶ 15.)  Only four objections

18  and 93 opt-outs from the approximately 3,576,000 Settlement Class Members were received.  (*Id.*

19  ¶¶ 16-17.)  The class members' overwhelmingly favorable response to the settlement is a strong

20  indicator that the settlement is fair, reasonable, and adequate and should be approved.  *See, e.g.*,

21  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009); *Fulford*, 2010 U.S. Dist.

22  LEXIS 29042, at *12.

### 8. The Settlement Is the Product of Arm's-Length Negotiation

24  The settlement here is the product of extensive arm's-length negotiations among

25  experienced counsel.  The parties attended an in-person mediation on January 31, 2017, before

26  Hon. Morton Denlow (Ret.) of JAMS, former Magistrate Judge of the Northern District of

27  Illinois.  While the parties were unable to reach an agreement at that mediation, they continued to

28  negotiate and executed a Class Action Settlement Term Sheet on May 19, 2017.  After the parties

1   were initially unable to negotiate a formal settlement agreement, the parties ultimately executed a

2   formal Stipulation of Settlement on July 12, 2017.

3          Along with the contentious nature of the negotiations, the fact that SolarCity and Plaintiff

4   participated in a mediation before Judge Denlow further demonstrates the non-collusive nature of

5   the settlement.  *See In re Apple Inc. Sec. Litig.*, No. 5:06-CV-05208-JF (HRL), 2011 U.S. Dist.

6   LEXIS 52685, at *10 (N.D. Cal. May 17, 2011) ("Because the settlement is the product of a

7   formal mediation session and several months of negotiations conducted at arm's length, the Court

8   is satisfied that the settlement is not the product of collusion."); *Hughes v. Microsoft Corp.*, Nos.

9   C 98-1646C, C 93-0178C, 2001 U.S. Dist. LEXIS 5976, at *17 (W.D. Wash. Mar. 26, 2001)

10   (settlement mediated with assistance of appointed settlement judge demonstrates lack of fraud or

11   collusion).  The Settlement was reached as a result of the formal mediation process and after

12   extensive arm's-length negotiations between the parties.[7]

13   **VI.     CONCLUSION**

14          The proposed Settlement is fair, reasonable, and adequate.  It provides substantial cash

15   recovery to the class.  The Settlement is particularly generous given the serious obstacles Plaintiff

16   would have faced both on the merits and in maintaining a certified class through any trial in this

17   case.  The positive response of Settlement Class Members is further evidence that the Settlement

18   is fair, reasonable, and adequate.  SolarCity respectfully requests that the Court overrule the

19   objections, approve the Settlement, and enter final judgment.

20   Dated: January 4, 2018                              TIFFANY CHEUNG
                                                        MORRISON & FOERSTER LLP
21

22                                                      By:   */s/ Tiffany Cheung*
                                                        Tiffany Cheung
23

24                                                      Attorneys for Defendant
                                                        SOLARCITY CORP.
25

26   _____

27          [7] In light of the terms of the settlement agreement, including that it does not have a
     "clear-sailing" fees clause (ECF No. 171-1), the analysis under *In re Bluetooth Headset Products
28   Liability Litigation*, 654 F.3d 935 (9th Cir. 2011), is not implicated here.